Filed 10/30/14  P. v. Hunt CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ADAM SPENCER HUNT, <br><br> Defendant and Appellant. | H037380 <br> (Santa Cruz County <br> Super. Ct. No. F19825) |
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> KENNETH KIRK CLAMP, <br><br> Defendant and Appellant. | H038256 <br> (Santa Cruz County <br> Super. Ct. No. F19826) |

## I.  INTRODUCTION

Defendants Adam Spencer Hunt and Kenneth Kirk Clamp were jointly tried for murder and other crimes against Elias Sorokin.[1]  Sorokin's body had not been found by the time of trial.

---

[1]  Although defendants were jointly tried, they were charged by separate informations.  This court ordered the appeals from the two cases considered together.

Defendant Hunt was convicted of robbery of Sorokin (Pen. Code, § 211),[2] and the trial court sentenced Hunt to five years in prison. Defendant Clamp was convicted of first degree felony murder and robbery of Sorokin. (§§ 189, 211.) The jury further found true allegations that Clamp had two prior serious felony convictions that also qualified as strikes. (§§ 667, subds. (a), (b)-(i).) The court sentenced Clamp to the indeterminate term of 75 years to life consecutive to the determinate term of 10 years. The court granted Clamp 872 days presentence custody credit.

On appeal in case No. H037380, defendant Hunt contends that: (1) there is insufficient evidence to support his conviction for robbery; (2) the trial court erred by admitting evidence of his financial circumstances; and (3) the court erred by admitting into evidence hearsay statements by Stewart Skuba. For reasons that we will explain, we will affirm the judgment.

On appeal in case No. H038256, defendant Clamp contends that: (1) there is insufficient evidence to support the convictions for robbery and murder; (2) the trial court erred by admitting into evidence hearsay statements by Skuba; (3) the court erred in failing to adequately respond to a jury question; and (4) Clamp is entitled to additional presentence custody credit. For reasons that we will explain, we will modify the judgment by awarding Clamp a total of 765 actual days credit, order clerical errors in the abstract of judgment and a minute order corrected, and affirm the judgment as so modified.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Defendant Hunt was charged with the murder and second degree robbery of Sorokin. (§§ 187, subd. (a), 211; counts 1 & 2.) Defendant Clamp was separately charged with the murder, second degree robbery, and kidnapping of Sorokin. (§§ 187, subd. (a); 211; 207, subd. (a); counts 1–3.) It was further alleged that Clamp had two

---

[2] All further statutory references are to the Penal Code unless otherwise indicated.

prior serious felony convictions that also qualified as strikes (§ 667, subds. (a), (b) - (i)), and that he had served a prior prison term (§ 667.5, subd. (b)).

The prosecution's theory of the case was that Skuba planned to use chloroform on Sorokin and rob him. According to the prosecution, Skuba and his friend, defendant Hunt, ultimately beat Sorokin at Skuba's residence until he was unconscious. Hunt subsequently left the residence, and defendant Clamp arrived to help Skuba. Clamp and Skuba drove Sorokin to another location where he was thrown off a cliff. Clamp, Skuba, and later Hunt returned to Skuba's residence to divide up the items taken from Sorokin.[3] The prosecution's witnesses at trial included four people who were at Skuba's residence when the incident occurred: Kristin Roberts, who was romantically involved with Skuba; Kristin's father George Roberts, Sr.; Kristin's brother George Roberts, Jr.;[4] and Skuba's friend Timothy Wentzel. These witnesses testified inconsistently about many details.

Prior to trial, defendant Clamp filed a motion to bifurcate trial on the alleged prior convictions. The court granted the motion.

Also prior to trial, defendants Hunt and Clamp sought to exclude hearsay statements made by Skuba to Kristin. The trial court conducted a hearing regarding Kristin's proposed testimony. (See Evid. Code, §§ 402-403.) The court determined that there was a conspiracy to rob the victim when Hunt arrived at Skuba's residence, and that Skuba's subsequent statements to Kristin that the " 'chloroform didn't work' " and that " 'they got into a fight' " would be allowed at trial under the coconspirator exception to

---

[3] We take judicial notice of this court's opinion in *People v. Skuba* (Dec. 26, 2013, H037984) [nonpub. opn.]. In *People v. Skuba*, this court affirmed the judgment of conviction of Skuba for first degree felony murder and second degree robbery of Sorokin. (*Id.* at pp. 1, 12, 23.)

[4] These members of the Roberts family testified at trial. For clarity and convenience, we will refer to Kristin Roberts by her first name. We will also refer to her father George Roberts, Sr. and her brother George Roberts, Jr. as Senior and Junior for clarity and convenience.

the hearsay rule.  The court also tentatively ruled that statements against Skuba's interest would be admitted at trial, including his statement to Kristin that he drove the victim's truck, that Clamp followed in another truck, and that they threw the victim's body off a cliff.

During trial, the prosecution indicated an intent to show a video of an interview of defendant Hunt by law enforcement.  The video contained references to Hunt's financial circumstances.  Hunt filed a motion to preclude the prosecution from introducing evidence of his poverty or financial need on the ground that such evidence was inadmissible to establish his motive for the robbery.  The trial court denied Hunt's motion.

**A. *The Prosecution's Case***

### 1. Background

Stewart Skuba lived on Felix Street in Santa Cruz.  He sold methamphetamine and marijuana.  Skuba and the victim, Elias Sorokin, had known each other for a few years and had done marijuana deals together.  The victim had been to Skuba's mother's house a few times.

At the time of the incident in July 2009, Skuba was 31 years old and was "romantically involved" with Kristin Roberts, who was 19 years old.  Kristin had known Skuba for about two years and had been living with him for about a month.  Prior to that time, Kristin was homeless and unemployed.

Kristin had known defendant Hunt for about two years and defendant Clamp for about a month.  She had met both defendants, who were older than her, through Skuba.  Skuba had music equipment in his bedroom, and it was common for Hunt to be working on music in Skuba's room during the late night and early morning hours.  Hunt sometimes had headphones on while he was working on music.

Kristin testified that Skuba stole checks from a housemate and that she made those checks out to herself, Marjorie Jackson, and another person.  Kristin further testified that

4

she pleaded guilty to a felony violation of Penal Code section 470[5] in July 2009 in connection with the check case. Kristin's father, George Roberts, Sr., came to Santa Cruz in July 2009 to help her. Senior was trying to save money to rent a place but helped bail her out instead. Skuba did not have money to pay back Senior for the bail but promised to do so. Senior and his son, George Roberts, Jr., began staying at Skuba's Felix Street residence around this time. The residence had three stories, and Kristin lived with Skuba on the first floor, Senior and Junior stayed on the second floor, and college students lived on the third floor.

## 2. The Night of July 20, 2009

### a. *Kristin Roberts's testimony*

In July 2009, Kristin was an "extreme alcoholic" who drank as soon as she woke up and until she went to sleep. She had also been using methamphetamine daily for about five years. When she was under the influence of methamphetamine, Kristin was sometimes unintelligible and experienced delusional thinking and paranoia. She also smoked marijuana from time to time.

At trial in July 2011, Kristin testified that she had "done a 360" from where she had been in her life. She was clean and sober for more than a year, and was a born-again Christian and a mother. She had also pleaded guilty to robbing Sorokin. Under an agreement with the district attorney's office, she faced a potential term of up to five years in prison. Other counts in the case against her were dismissed, including a count for being an accessory after the fact, and a misdemeanor case and violations of misdemeanor probation in other cases against her were also dismissed. One of the conditions of the agreement was that she testify truthfully in any proceeding concerning the case. Her testimony was also to be considered with respect to the resolution of the check case in

_____

[5] Section 470 defines the crime of forgery.

5

which she had violated probation. She was currently serving a prison sentence for causing injury while driving under the influence.

Kristin initially testified at trial that, days before the incident, she asked Skuba about a black container that she saw in his bedroom. Skuba stated that it was chloroform, and that he was going to use it to knock out a person who was coming from another city. Skuba indicated that the person had a lot of "weed" or a lot of money, and that he was going to "jack" the person, meaning take whatever the person had. Hunt was also present in the bedroom, but Kristin did not remember him saying anything. On the day of the incident, Skuba again told Kristin that a person was coming from another city, that chloroform was going to be used to knock the person out, and that Skuba was going to take money from the person.

Kristin subsequently testified at trial, after reviewing her prior statement to investigators, that Skuba did not mention robbing the person until the day of the incident and that defendant Hunt was not present during the conversation. She also testified that Skuba never talked about chloroform in relation to robbing the person; he only indicated that he had chloroform. Kristin further testified that she was not sure whether defendant Hunt was present during the discussion about chloroform.

Kristin testified that in the evening, she was in Skuba's bedroom with Skuba, Tim Wentzel, and defendant Hunt. In testimony under oath at a prior hearing, Kristin initially stated that only she, Skuba, and Wentzel were present, and later stated she was " 'not sure' " whether Hunt was present. At trial, Kristin testified that a person named Hatfield, who was also known as Kenny Wayne, was at the Felix Street residence earlier in the day, but she did not see him later. Hatfield drove a red Mustang, and Kristin did not see the vehicle outside Skuba's residence that night.

Since waking up, Kristin had consumed one and a half pints of bourbon whiskey, and she continued to drink it in the bedroom. Kristin felt "fine" from drinking, and testified that it would take a liter for her to get drunk. Skuba, Wentzel, and Kristin were

6

also smoking methamphetamine, which made Kristin feel "alert." She did not recall Hunt smoking. Hunt was working on music, and Kristin did not remember whether he was wearing headphones during the course of the day while he was in Skuba's bedroom.

After about an hour, Skuba asked Kristin to go upstairs and stated "he was going to handle some business." It was Kristin's understanding that the person who Skuba had previously talked about was coming over. Kristin testified that defendant Hunt remained downstairs while she and Wentzel went upstairs to a living room. Kristin's father and brother were already upstairs sleeping in a bedroom.

While upstairs in the living room, Kristin continued drinking whiskey and watched episodes of the television show "That's So Raven" with Wentzel. Kristin never mentioned in interviews with investigators that Wentzel was upstairs with her.

After Kristin went upstairs, she heard someone enter the front door and then heard Skuba's bedroom door shut. Skuba's bedroom had two doors, one of which led to the interior of the house, and a second door which led to an outdoor patio that was next to a door to the garage. While upstairs, Kristin eventually heard someone saying loudly, " 'Please, don't. Stop.' " It was not the voice of Skuba or defendant Hunt. The person sounded frightened and the voice was muffled as though a hand was over the person's mouth. The upstairs living room where Kristin was located was on top of the garage and Skuba's bedroom, and the voice sounded like it was coming from the garage. Kristin testified that the struggle she heard occurred during the third episode of "That's So Raven," but she told investigators it occurred during the second episode.

Kristin heard "a bunch of banging around downstairs" for approximately five minutes. It sounded as though "somebody was getting in a fight," with "a bunch of movement" and "something was in the way and they knocked it over." Kristin paced back and forth, turned up the volume on the television, and said " 'No, Skuba, no.' " She thought Skuba was involved in something downstairs with the person who had come over.

7

According to Kristin, her father and brother came out of the bedroom while the "banging" noise continued. Both were really mad, and Kristin's father was going to call 911. Kristin stopped him because she "didn't think that the situation would turn out the way it did and [she] didn't want to get [defendant Hunt] or [Skuba] in trouble." Kristin also told her brother to go back to sleep. According to her testimony at a prior hearing, Kristin tried to push her father and brother back into the bedroom, but at trial she did not remember trying to do so. Her father and brother eventually went downstairs and left the residence.

After the noise stopped, Kristin did not hear any further sounds from the garage. Skuba eventually came upstairs holding clothes. He was sweating and looked "freaked out." He proceeded to the third floor, started the washer, and then went back to the first floor. Kristin went downstairs about half an hour after she heard the struggle in the garage. Wentzel had left the residence.

While downstairs, Kristin heard water running in the bathroom. She knocked on the door and heard defendant Hunt say, " 'I'm in here.' " Kristin never mentioned this exchange with Hunt during her first interview with investigators, and indicated that she was not sure who was in the bathroom during her second interview with investigators.

Kristin saw Skuba on a patio outside his bedroom, so she joined him to have a cigarette for about 10 minutes. Skuba still looked sweaty and "freaked out." He was also wearing different clothes than when she saw him previously. Skuba told Kristin that the chloroform "didn't work," that " '[w]e got into a fight,' " and that the person was "knocked out" in the garage. Skuba never clarified who "we" referred to. Kristin assumed Skuba was referring to defendant Hunt "because he was the one there." In an initial interview with investigators, Kristin reported only that Skuba told her to "keep it solid," "don't say anything," and "don't go in the garage." While Kristin was standing outside with Skuba, she was eight to ten feet from the door of the garage. She did not

8

hear any noise coming from the garage, or anything to suggest that there was someone alive in the garage.

Kristin went to the front of the residence and smoked another cigarette. She saw a big gold truck, with a camper shell, that she had never seen before. She went to the passenger seat to look for something to steal and saw cell phones. Skuba appeared and told her to get out of the truck. Kristin did not take anything and went back into the residence.

Kristin testified that she heard Skuba say on his cell phone, " 'Hey, homeboy, get over here. I need your help.' " Kristin variously stated under oath and to investigators that Skuba stated before, during, or after this call that defendant Hunt had left. Skuba was upset. The phone call took place about half an hour after Kristin had smoked a cigarette on the patio with Skuba.

Defendant Clamp arrived at the residence about 15 minutes after the call. Kristin saw Clamp's red truck at the residence at some point. Clamp asked Skuba, " 'What . . . is she doing here?' " Skuba responded with "something along the lines that [Kristin] was okay." In the ensuing conversation, Clamp indicated that he was upset that Skuba had "ripped . . . off" the victim with defendant Hunt and not with Clamp. Clamp also asked Skuba "if he could live with this for the rest of his life." Skuba said, " 'Yes, he knows where my mom lives.' " Although Kristin testified that she was in the bedroom during this conversation, she previously told investigators that she was outside the room and that she had heard this portion of the conversation through the door. Kristin testified that Clamp next told her "to clean up the blood in the garage while they were gone." She previously told investigators that she did not know who asked her to clean up the blood.

Kristin eventually went back upstairs and outside onto a balcony. There was a strong smell of chemicals that Kristin had never smelled before. She saw Skuba outside walking to the garage with a big blue blanket. Kristin did not know where defendant Clamp was. Kristin heard the garage door open, a "dragging" sound, "a big thud" like

9

someone was being put in the truck bed, and then the tailgate shut. She eventually heard the garage door close and the engines of two "trucks reversing out of the driveway" "[m]aybe a little less" than an hour after she had gone to the upstairs balcony. She did not actually see the vehicles leave the residence. She testified at a prior proceeding that she heard only one vehicle and that she " 'assume[d]' " the other vehicle " 'went right behind it.' "

Kristin got some "409" cleaner from the kitchen and walked through Skuba's bedroom. She noticed items in the room that she had not seen earlier in the evening. There was a guitar, a laptop computer, and a wallet. In the wallet, Kristin found the victim's driver's license and more than four credit cards. There was also a duffle bag and boxes of "Green Bean" pills in the room. In testimony at a prior hearing, Kristin also stated that she saw marijuana. She previously told investigators, however, that she did not see marijuana until later.

At some point, Kristin cleaned up blood in the bathroom, where she saw "specks" of blood in the sink and on the floor.

Kristin eventually went outside and saw defendant Hunt approaching the residence. She had not seen him since she had left Skuba's bedroom with Wentzel to watch television. Kristin testified that Hunt gave her a bottle of "409." Although Kristin had been interviewed by investigators between August 2009 and May 2010, she did not mention until May 2011 that Hunt had given her "409" cleaner.

Defendant Hunt asked, "[w]here did they go," and Kristin responded, "they took off." Kristin asked Hunt where he had been and he indicated at his car. Kristin did not remember seeing any blood on Hunt or his clothes being wet as if he had tried to clean them. Kristin proceeded to the garage. She did not know where Hunt went thereafter. She had previously seen Hunt drive a white Honda, but she never saw his car that day.

In the garage, Kristin saw a "bunch" of blood. In the back of the garage, there were "[s]pecks" of blood as though the blood "had gotten flung." Nearby was a "pool"

10

of blood where most of the blood was in the garage. There was also a line of blood about six inches wide running the length of the garage, from the pool of blood in the back of the garage to the front where the garage door lifts up. Regarding this line of blood, Kristin testified that it looked like the blood had smeared while the victim was dragged with the blanket across the garage. Kristin dumped both bottles of cleaning fluid on the blood on the ground and used a towel and a torn T-shirt, which "was already there for" oil leaks, to clean up the blood. She then went back inside the residence.

Skuba and defendant Clamp returned to the residence after more than an hour, and defendant Hunt arrived at the residence 45 minutes after them. After Hunt arrived, Kristin never heard any statement by Skuba or defendants such as, " ' "Where have you been?" ' " Kristin previously told investigators that she cleaned up the blood after Skuba and Clamp had returned to the residence.

There were 5 to 10 one-pound bags of marijuana, which was divided equally among Skuba, defendant Hunt, and defendant Clamp. The pills were also divided among the three men. Clamp put his portion of marijuana in a black North Face bag. By this point at least, Kristin was intoxicated from the alcohol and the methamphetamine.

Kristin testified that, when the marijuana was being divided, Skuba and defendant Hunt had a conversation about the chloroform not working, the victim getting "beat . . . up," and "one of them land[ing] on the other one." In an interview by investigators, Kristin indicated that the conversation did not take place that night and that she did not remember the specific time.

After the items were divided up, defendants Clamp and Hunt left Skuba's residence. Hunt never came back to the residence and Kristin never saw him again.

Kristin later asked Skuba what they did with the victim. Skuba indicated that he had driven the victim's truck with the victim in the back, and that defendant Clamp "was right behind him in a red truck." Skuba stated that they went up the coast, "that they

11

threw him off a cliff and that his body went thudding down." Skuba and Clamp then proceeded back to Skuba's residence.

Kristin testified that Skuba gave her a pound of marijuana in one bag, which was one-half of what he had, and some pills. She previously testified that Skuba gave her one bag of marijuana, and that he kept two bags. Kristin sold some of the marijuana and also gave some of the marijuana to her brother and her father.

Kristin testified that she had a cell phone but that it broke prior to July 20, 2009. Thereafter she could not make calls on the phone, but she could check her voicemail by calling from someone else's phone. When shown phone records reflecting calls from defendant Hunt's phone to her phone on July 21, 2009, at 12:58 a.m., 1:12 a.m., and 3:07 a.m., she testified that she did not recall receiving those calls and that she did not have any phone conversations with him that morning. When asked whether she remembered getting voicemail from Hunt, Kristin testified, "I didn't check it, I'm pretty sure, until way later."

### b. *Timothy Wentzel's testimony*

Timothy Wentzel testified that Skuba was a friend who regularly supplied methamphetamine to him and another friend, Felicia Wilkins. Wentzel was a "heavy user" of methamphetamine in July 2009, and used it every day. He stopped using methamphetamine in June 2010, about 11 months before trial. When Wentzel smoked methamphetamine, it made him paranoid and most of the time he heard and saw things that were not real. It also affected his memory, particularly his ability to remember things in chronological order, and affected his ability to keep track of time.

On the night of the incident, Wilkins dropped Wentzel off at Skuba's residence to buy methamphetamine. Wentzel went to Skuba's bedroom and saw Skuba, Kristin who was drinking alcohol, and defendant Hunt who was using the computer to work on music. During the entire time Wentzel was in Skuba's bedroom, Hunt had on headphones. Skuba, Wentzel, and possibly Hunt proceeded to smoke methamphetamine. After an

12

hour, Skuba asked Wentzel and Kristin, but not Hunt, to go upstairs so he could "handle some business."

Wentzel and Kristin went upstairs, sat on a couch that was above the garage, and watched "That's So Raven" on television. Within the first half-hour episode, Wentzel heard a "ruckus, like someone was moving a lot of stuff around" or "knocked some stuff over" downstairs. Kristin turned up the television volume "to drown it out," and said, " 'Skuba, don't. Skuba, don't. Why, Skuba?' " Kristin appeared very emotional to Wentzel and on the verge of tears. The banging and slamming noises grew louder. Wentzel was high at the time and felt paranoid, which made him think that he was hearing things and that there were people outside trying to get in the house. He did not hear any voices from downstairs.

Senior and Junior came out of their room and argued with Kristin. Wentzel never saw Junior go to the balcony before the noise started. Senior and Junior eventually went downstairs, and Wentzel did not see them again.

Skuba came upstairs out of breath and told them he was "done with his business" and that they could go back downstairs. The noise had already stopped by this point. Wentzel exited the residence. He did not see Kenny Wayne that night, and he did not see any vehicles parked around Skuba's residence.

Thereafter, Wentzel smoked more methamphetamine with Wilkins at other locations. Wilkins and Wentzel called Skuba to see if "everything was okay." Skuba said he was "okay" and would call later. Wentzel testified that he never called Skuba thereafter and never saw Kristin or defendant Hunt again. Phone records reflect numerous calls between Wentzel's phone and Skuba's phone from July 16 to 30, 2009. There were also calls between Wentzel's phone and defendant Clamp. Wentzel testified that Wilkins had used his phone to talk to Clamp and Skuba.

13

### c. *George Roberts, Sr.'s testimony*

George Roberts, Sr. had been convicted of grand theft in 1985 and 1993 and vehicle theft in 1993. According to Senior, when Kristin drank alcohol, she would get hysterical and often exaggerated things. Senior's 17-year-old son, Junior, was having problems related to marijuana and had been homeless. Senior testified that during the July 2009 time period, he took what Kristin or Junior said "with a grain of salt."

After Senior posted bail money for Kristin and paid for her work release, he was "[p]retty close" to being broke. Skuba told Senior that he would pay back the bail money, but Senior did not think Skuba would actually do so.

Senior and Junior began staying at Skuba's Felix Street residence before the incident occurred. A few days before the incident, Senior saw a little black bottle in Skuba's room. Skuba said it was chloroform. Senior jokingly told Skuba that Senior "would use chloroform" on a real estate agent that had "ripped [Senior] off."

On July 20, 2009, Senior went to bed about 8:30 or 9:00 p.m. He had taken medications that made him groggy and drowsy, and he had also used marijuana. Senior was awoken by Junior, who appeared agitated, excited, and hyper. Senior believed there was a "grave situation" downstairs based on Junior's statements about what he had heard. Junior indicated that it sounded like somebody was being " 'killed' " or " 'beaten up.' " Senior grabbed his phone, walked out of the room, and saw Kristin and Wentzel sitting on a sofa. Senior went to the stairs and asked Kristin what was " 'going on' " and indicated that he was about to call 911. Kristin told him not to call 911, that it was just " 'an argument,' " and that Senior should " '[g]o back to bed.' " Ultimately, Senior did not call 911 because he did not hear any disturbance, and because Kristin and Junior may have been under the influence and exaggerating things. At most, Senior heard a "furniture noise," such as a chair moving, but no noise from downstairs that sounded like a fight.

14

Senior was upset at being woken up for what may have been nothing and because Kristin would not explain what was going on. He went back to his room, got dressed, and left the house. Senior did not want to be involved if something was going on. He did not hear anything outside. He saw a gold Toyota Tacoma pickup truck with a camper shell on it parked near the garage. Senior went to his own car for a few minutes, then took his dog for a walk. Junior accompanied Senior for the walk. Senior and Junior eventually returned to Senior's car. Prior to falling asleep in the car, Senior saw a red pickup pull into the driveway. Senior later woke up to see the red pickup and then the gold pickup leave. He did not see the driver of either vehicle. When Senior saw these vehicles, he did not see any red Mustang. He also did not see Kenny Wayne at Skuba's residence on the day of the incident.

### d. *George Roberts, Jr.'s testimony*

George Roberts, Jr. testified that he had "done a lot of drugs," specifically marijuana and methamphetamine, and that his memory had been affected by the drugs, among other things. He tried to stop using methamphetamine about two weeks before trial but had had two relapses. Junior was homeless and was worried about being viewed as a snitch for testifying at trial. According to Junior, if a person cooperates with the police, the person is viewed as a rat by others living on the street, and gets "beat down" and "kicked out of Santa Cruz."

Junior testified that on the day of the incident, he was smoking weed all day and got drunk. Before going to bed, he saw Kristin and "Tim." Junior fell asleep and then got up later to smoke a cigarette on a balcony. Junior observed three males outside. The first, who Junior only saw from behind, was wearing a brown golfer's hat. Junior later saw a missing person poster with Sorokin wearing a similar hat. The second person was Skuba. Junior previously reported to investigators that the third person was defendant Hunt, and he later stated it was Ken Hatfield. By the time of trial, Junior was not certain of the identity of the third person.

15

Junior went back to sleep but was awoken by a muffled noise which continued for 15 or 20 minutes. It sounded like someone was screaming with a hand over the mouth. Junior was worried, so he woke up Senior, who was groggy, and told him that it sounded like someone was getting "beaten up" downstairs. Senior exited the room and threatened to call the police. Kristin responded, " 'No. No. No. You don't need to do that. Don't get involved in anybody else's business.' " Kristin tried to push both of them back into their room. Senior eventually exited the residence. Junior testified that he screamed at Kristin and asked what was going on, and that she slapped him after he refused to go back into his room. Junior eventually went to his room and gathered some of his clothes to leave.

When Junior went downstairs, he saw defendant Hunt walking out of Skuba's room. Hunt looked "a little jumpy" and as though he had just gotten in a fight. Junior asked, " '[D]o you know anything that's going on?' " Hunt responded, " 'Did you hear something?' " Junior said, " 'A little bit.' " Hunt said, " 'Don't worry about it,' " and walked into the bathroom. Junior saw Hunt look at himself in the mirror just before the bathroom door closed, and Junior heard "the sink turn on" and water running. Junior acknowledged that he could not have seen inside the bathroom from where he was standing at the foot of the stairs.

Junior went outside and saw in the driveway a newer "[s]ilverish" four-door Toyota truck with a shell on it. Junior tried to jump up to look through a little window in the garage door, but did not see anything. Junior walked about half a block from the residence when Skuba came up to him. Skuba looked "a little nervous and jumpy." He told Junior, who was crying because Kristin had slapped him, to stop crying and stated, " 'I just did something to help you guys and I put both of our lives . . . in jeopardy.' " Skuba also stated something to the effect that "our money problems are solved now" and that they had " 'obtained a pickup truck.' " Junior asked Skuba what he was talking about, but Skuba would not say what he had done.

16

Junior saw Skuba return to his residence, come outside with two rolling suitcases, load them into the front passenger seat of the truck, and drive away. Junior never saw anything loaded into the back of the truck. A red Mustang followed the truck. Ken Hatfield, who was also known as Kenny Wayne, drove a red Mustang, and Junior may have seen him at the residence before the incident. Junior never saw a red truck. At some point, Junior saw a smaller Toyota truck pull up and two males exit and walk toward the driveway. Junior did not recall whether this smaller truck left at the same time as the silver truck. After the silver truck left, Junior and Senior walked their dog and then returned to their car to sleep. Later, Junior went back inside Skuba's residence and Kristin gave Junior about an ounce of marijuana.

### e. *Cell phone records*

An intelligence analyst testified concerning various individuals' cell phone records. The analyst worked for a multi-agency task force that handled major drug cases and provided assistance to government agencies "when they need[ed] help with looking at a case and looking for patterns and trends," including phone patterns.

When a call is made on a cell phone, the call connects to one of multiple antennas on a cell phone tower. The resulting information provides "a general idea of where the call is made" although not the exact location. The exact range of a cell phone tower is difficult to determine and depends on topography, the amount of cell phone traffic, and other factors. When the cell phone records of the victim, Skuba, and defendants Clamp and Hunt were analyzed by the prosecution, it was assumed that the cell phone towers had a three mile radius.

On July 20, 2009, there were three calls between defendant Clamp's phone and Skuba's phone between 6:15 p.m. and almost 8:00 p.m.

The last call between the victim's phone and Skuba's phone was on July 21, 2009, at 12:31 a.m., with Skuba's phone being in an area of Santa Cruz that included his Felix Street residence.

Thereafter, also on July 21, 2009, there were two phone calls between Skuba's phone and Clamp's phone at 1:01 a.m. and 1:03 a.m., and two more phone calls between the phones at 1:51 a.m. and 1:59 a.m. About an hour later, there were phone calls from Clamp's phone to Skuba's phone at 2:54 a.m. and 2:57 a.m. The phone records for these latter two calls were consistent with Clamp's phone moving westbound out of Santa Cruz on Highway 1 north. There was no other call activity on Clamp's phone for the next hour. There were also no further cell towers in the westerly direction that Clamp's phone was traveling.

Prior to 2:55 a.m., the phone records for Skuba's phone were consistent with him making calls from his residence on Felix Street. Between 2:55 and 2:58 a.m., there were four phone calls from Skuba's phone. The phone records were consistent with Skuba's phone moving westbound up Highway 1 out of Santa Cruz. One of the calls, at 2:57 a.m., was to Clamp's phone. By the time of the call at 2:58 a.m., Skuba's phone had continued moving and was west of the last cell phone tower. There was not another cell phone tower for some distance up the coast. The phone records of Skuba and defendant Clamp were consistent with the two of them traveling in separate vehicles westbound on Highway 1 north shortly before 3:00 a.m. For approximately the next hour, from 2:58 to 3:58 a.m., no calls were made from Skuba's phone, and all calls to his phone went to his voicemail. There was "the same void" of calls on Clamp's phone during that same time period. If a phone is turned off, or if it is out of range of a cell phone tower, a call to that phone will go to voicemail.

For example, at 3:08 a.m., a phone call was made from defendant Hunt's phone to Skuba's phone, but the call went to Skuba's voicemail. Just prior to this call, a 22-second call was made from Hunt's phone to the phone number associated with Kristin. Hunt's phone records were consistent with him being in the general area of Felix Street and downtown Santa Cruz between 12:53 a.m. and 4:00 a.m.

18

At 3:57 a.m., Clamp's phone called an unknown phone.  During the call, Clamp's phone was moving in an easterly direction, coming back into Santa Cruz on the west side.  During the next call to the same phone number at 3:58 a.m., Clamp's phone continued moving in an easterly direction on southbound Highway 1.

At 3:56 a.m., a call was made from Hunt's phone to Skuba's phone.  Hunt's phone was in an area of Santa Cruz that included Felix Street.  Skuba's phone was moving in an easterly direction, coming back into Santa Cruz on the west side.  Skuba's phone received another call at 4:02 a.m., and the phone records reflect that Skuba's phone was moving in an easterly direction down Highway 1.  The analysis of defendant Clamp's and Skuba's phone records was consistent with the two of them returning in tandem back into Santa Cruz just before 4:00 a.m.

### 3. Subsequent Events

#### a. *Kristin Roberts's testimony*

Within days of the incident, Skuba and Kristin went to Target and tried to use the victim's credit card, but the card did not work.  In an interview with investigators, Kristin denied using the credit card and denied knowing that the credit card belonged to the victim.

Regarding the guitar that Kristin had seen in Skuba's room after the incident, she learned that Skuba later gave the guitar to her brother.  Her brother found a cell phone in the guitar case.  Kristin broke the phone because she thought it belonged to the victim and she was concerned that someone might get in trouble.

At some point, Kristin saw the victim's picture in the paper.  She also talked to her father about her involvement in the case.  Her father wanted to report it.  Kristin was scared "that they wouldn't want [her] around to tell on them."

Although Kristin testified that she was scared of defendant Clamp, in the days after the incident she was "regularly hanging out with" Clamp's brother.  Further, on July 29, 2009, Kristin visited Clamp's residence on the west side and gave him a birthday

19

card.  The red truck that Kristin had previously seen was at Clamp's residence.  Clamp was upset that Skuba had left town.  Kristin, Clamp, his brother, and his brother's daughter went to a bar.  Clamp told Kristin that he started a forest fire.  At the time, Kristin did not know what he was referring to.  Later, Kristin saw a news story about the victim's truck on fire up the coast.  At some point, Kristin had seen the gold-colored truck parked down the street from where Clamp was staying on the west side.

On July 30, 2009, Kristin went to a Watsonville hotel where Skuba was staying.  She and Skuba talked about selling their remaining marijuana and about the burned truck.  Skuba, Kristin, and two others were subsequently in a vehicle to sell marijuana when they encountered Watsonville police.

On the third day of Kristin's testimony at trial, while she was being cross-examined by defendant Hunt's counsel, Kristin looked in defendant Clamp's direction and stated, "Excuse me.  Why don't you do that on the record?"  Kristin later testified that Clamp had made a "cutting motion" across his throat while he was "hiding behind his attorney and from the jury."  Kristin interpreted the motion to mean, "You're dead," and was frightened and cried after she saw it.  A video of the courtroom at the time of Clamp's hand motion was played for the jury.  Kristin testified that the video showed Clamp's hand moving under his neck.

### b.  *Timothy Wentzel's and Felicia Wilkins's testimony*

Wentzel testified that a few nights after the incident at Skuba's residence, he was with Wilkins in her car in a parking lot when defendant Clamp pulled up.  Wilkins and Clamp were close friends.  Wentzel testified that Clamp was driving a silver, four-door truck, and that Clamp had said he borrowed it from a friend.  Wilkins testified similarly about the encounter with Clamp.  According to Wilkins, Clamp was in a silver, four-door Toyota truck.  Wilkins never saw the truck again.

Wentzel testified that a few months later, he learned from a news article that Skuba and defendants Hunt and Clamp had been criminally charged.  Wentzel was

20

concerned that he had been at the Felix Street residence when something had happened. He also saw an article about a truck getting burned and noticed that the truck, based on a picture and a description, looked similar to the one defendant Clamp had been driving.

Wentzel testified that he lied to a defense investigator by stating he was not present the night of the incident, that he did not know defendant Hunt, and that Skuba had come upstairs with swollen and purple lips and a red mark on his forehead. He further testified that he lied by saying that he saw and heard defendant Clamp the night of the incident, and that Skuba met with Clamp while Wentzel was downstairs. Wentzel also testified that he lied to an investigator from the district attorney's office when he stated that Hunt had come in from the garage with blood on his hands and then went to the bathroom to wash himself; that Skuba went out to the garage and then came back, telling Wentzel, " 'I think he [Hunt] killed my friend' "; and that Hunt pushed Skuba against the wall, said something, and then left.

Wentzel made some of the statements he claimed were false during or after he spent time in jail with Skuba. Wentzel was in jail between June and September 2010, about a year after the incident and a year before trial, for felony and misdemeanor convictions of petty theft with a prior. Skuba was in the same jail pod as Wentzel. Wentzel testified that Skuba asked him to lie about what had happened, and that they came up with a story for Wentzel to tell to "minimize [Skuba's] involvement . . . and up-play [Hunt's] input." Wentzel testified that he went along with the lie because Skuba had taken him "under his wing" and protected Wentzel while in jail.

### c. *George Roberts, Sr.'s testimony*

Senior returned to the Felix Street residence after the incident to collect his belongings. While in Skuba's room, Kristin told Skuba to give Senior a credit card, but Senior refused it. The credit card had Sorokin's name on it. Senior overheard Kristin and Skuba talk about credit cards that were taken from the gold truck and that the value of the cards was up to $50,000. Kristin had a bag of marijuana and she gave a handful to

21

Senior. The whole house smelled like marijuana. Senior testified that the marijuana and credit cards he was given or offered "[c]ould have been" in lieu of the money Skuba owed him for Kristin's bail.

After sleeping in a car for one or two nights, Senior and Junior moved to the National 9 motel, where they stayed for two or three weeks. Kristin eventually moved into Senior's motel room and brought "green beans" with her. While Senior was at the motel, he testified inconsistently about whether he received marijuana from Ken Hatfield. Hatfield was at Skuba's residence on a regular basis.

Phone records show numerous calls between Senior's and Skuba's phones from July 20 through 29. Senior testified that the calls were between him and Kristin, or between Kristin and Skuba.

Senior testified that he went to the police on July 30, 2009, after he had talked to Kristin who was hysterical and afraid for her life. Since the incident, Kristin had continued drinking and had an ongoing conversation with Senior about what had happened although not in great detail. Kristin showed Senior a newspaper article about a missing man and a burned truck. She told Senior that the marijuana had come from the man who had a "bunch" of it. She also stated that she knew something was going to happen but did not know " 'it was going to go that far.' " She told Senior that she had been forced to clean up blood, and that she had been threatened with getting "capped." Kristin did not tell Senior who threatened her, and he saw her with Skuba, Clamp, and Hatfield after the July 20 incident. Kristin further told Senior that she saw a lot of credit cards and a book of checks on Skuba's bed.

Senior was scared and went to the police. He told the police that on the evening of the incident, he had been awakened at the Felix Street residence by a noise, that he heard banging and crashing sounds, that it sounded like someone was getting pushed into something, and that he had heard a muffled scream and " 'muffled sounds like "Help." ' " Subsequently at trial, he stated that Junior had told him these things upon waking him up,

22

and that he (Senior) had actually not heard anything. Senior testified that by telling the police he had heard sounds and that Junior's knowledge was based only on what Senior had told him, Senior was trying to protect Junior and "insulate him from contact with law enforcement." Senior also testified that he was trying to protect his children "from any kind of involvement in trouble," and that he would lie to protect his children. During the police interview, Senior had a panic attack and was taken to the hospital after he was told that he could become an accessory after the fact. After about an hour at the hospital, Senior returned to finish his interview with the police.

While Senior was being interviewed by the police, he was told that Kristin had been taken into custody. He also had multiple phone communications with Junior, who informed him during one of the calls that the police were searching their motel room. Shortly after learning of the search, Senior told the police that he thought the garage incident had something to do with the credit cards, checks, and marijuana. Junior also asked Senior during one of the calls, " 'what should I say? I want to make sure I get it right.' "

### d. *George Roberts, Jr.'s testimony*

On the day following the incident, Skuba told Junior he had "weed" for him. Skuba also agreed to give Junior a guitar that Junior had seen in Skuba's closet. Skuba's closet had "a lot of weed" in black plastic garbage bags. Skuba opened one bag and inside was a clear bag containing five or six pounds of marijuana. Skuba gave Junior close to one pound of marijuana. Junior sold a part of it over the next several days. Skuba gave Senior a handful, or about an eighth of an ounce, of marijuana.

After Junior and Senior went to the motel, Kristin came over with at least a pound of marijuana in plastic bags and some green bean marijuana pills. She gave Junior a handful of marijuana and Senior about an ounce. Kristin left the motel after telling Junior not to touch the remainder of the marijuana and that she would be back. Junior

23

nevertheless took more marijuana and two or three vials of the pills. He eventually sold the marijuana for $3,000.

According to Junior, Skuba stated that he got about ten pounds of marijuana as a result of the incident. Junior saw Skuba with three pounds of marijuana at the motel about three days after the incident. Junior also testified that Kristin admitted going to San Jose in the silver truck with Skuba to sell some of the marijuana.

Junior was interviewed by the police on July 30, 2009. He was allowed to talk to Senior by cell phone during the interview. Junior testified that during the interview he was feeling the effects of the marijuana and alcohol he had used, that his mind was "cluttered," and that he was "[f]orgetting very quickly" what he had said. He further testified that when the police brought him to the police station, he had to wait for more than three hours. Junior testified that he was livid and did not attempt to answer their questions truthfully. Rather, he said "anything and everything" to get himself out. Junior did not want to have anything to do with the case, he was mad at Kristin for putting him and their father in the situation, and he felt like the police were not listening to him when he told them that he knew very little and that they should talk to Kristin.

Junior testified that he lied, exaggerated, and/or was "trying to connect the dots" about what had happened when he reported to the police that he saw defendant Hunt in the bathroom; that he saw blood coming off Hunt's hands; that he later checked the bathroom sink and saw blood; that he saw blood in the garage after he had exited the residence; that Skuba said " 'I killed someone' " when he caught up to Junior outside the residence; that he saw the silver Toyota Tacoma pull up, the driver enter the residence, and then the driver come out and talk on his cell phone; and that Kristin's prints were all over the truck because she had searched it. He also repeated hearsay or gossip, such as that Kristin had burned the victim's truck with another person, without making clear to the police that he did not have firsthand knowledge.

24

### e. *Investigation*

In late July 2009, Denise Basaldua attempted to pass a $4500 check at a bank on Sorokin's account. Basaldua later told the police that she had gotten the check from Skuba at the Felix Street residence on July 24, that $800 was supposed to be her portion, and that Kristin was also at the residence.

Sorokin drove a gold colored 2008 Tacoma truck with a camper shell on it. On the evening of July 28, 2009, the truck was found on fire in a forested area approximately 125 feet from the road, and within a half mile of the intersection of Smith Grade and Empire Grade. The truck ultimately burned down to its frame. When a Santa Cruz County sheriff's deputy later processed the truck, it had an unusually strong odor of gasoline.

On July 30, 2009, Watsonville police observed Kristin, Skuba, and two others exit a stolen car. When ordered to stop, Kristin walked away while the others ran. Kristin was detained and searched. She had $410 in her pocket and a purse containing a cell phone, more than 50 grams of marijuana, and six bottles of marijuana pills or "green beans." The marijuana was from Skuba from the night of the incident and was in a plastic oven bag. In the trunk of the car was a laptop case containing 431 grams of marijuana and a cell phone. Skuba was ultimately located, arrested, and searched. He had $730.

After Kristin learned that she was going to be charged regarding the stolen vehicle and the marijuana, she asked to speak with a detective. Although Kristin did not appear to be under the influence of alcohol or methamphetamine to law enforcement, Kristin testified at trial that she was high and drunk at the time. Watsonville Police Detective Morgan Chappell met with Kristin, who seemed nervous and scared. Kristin stated that she wanted to talk about a murder, and that she would not say anything unless she had protection. At trial, Kristin testified that she was concerned that she would get killed for being a "snitch." She testified that her mother "was killed because she snitched on

25

somebody and they threw her body off a cliff making it look like a car accident." Kristin told law enforcement that she wanted protection for herself, her father, and her brother. Kristin testified at trial that she had reported what happened at the Felix Street residence because she "could not live with it for the rest of [her] life."

Kristin eventually provided information regarding the victim to multiple law enforcement agencies during several interviews between July 30 and August 3, 2009. Kristin reported that the victim was involved with marijuana. She disclosed that she had heard a muffled voice saying, " 'Please, don't. Stop,' " and that her father and brother had heard sounds. She also reported that chloroform may have been involved, that there was a lot of blood in the garage, and that the victim was beat up, put in the back of his truck, and thrown off a cliff. She reported that Skuba and defendants Hunt and Clamp were involved. Kristin testified that she tried to minimize her involvement when making the report to law enforcement because she "already knew [she] was in trouble." For example, she initially denied knowing that marijuana was involved in the case, initially denied knowing that the victim's credit card had been used, denied cleaning the garage or going into the garage until much later, and stated that she was forced into becoming involved in the case.

On the evening of July 30, 2009, law enforcement contacted defendant Clamp and searched the bedroom of a Santa Cruz residence where he had been staying. Clamp had 1.8 grams of a substance that tested presumptive positive for heroin in his pocket. In the bedroom, there were approximately 0.2 grams of methamphetamine and a glass methamphetamine pipe.

There were also approximately 900 grams, about two pounds, of marijuana. Some of the marijuana was in plastic oven bags. Those plastic bags were in a backpack and a North Face duffle bag. The marijuana was "well-groomed" and "processed," containing a high THC percentage and with almost no stems or leaves. It appeared that the marijuana was possessed for sale based on the quantity of the marijuana and the type of

26

packaging which gave it a shorter "shelf life." A digital scale and resealable sandwich bags were also in the bedroom. If the marijuana was sold in half-pound increments, it would be worth $7,000 to $9,000. If it was sold in smaller increments, it could be worth more than $10,000. The duffle bag also contained 48 bottles that were labeled " 'Green beans' " and " 'Medical marijuana product.' "

Law enforcement also discovered a smaller red Mazda pickup truck that was registered to another resident. The keys for the truck were on defendant Clamp's bed. There were also gas cans in Clamp's room.

Clamp was arrested and interviewed by law enforcement. A video recording of the interview was played for the jury. In the recording Clamp admitted that he knew a person named Stewart, but denied that the person had asked him for help. Clamp indicated that he had passed through the person's house recently. He did not know why the person might have gotten arrested, and he indicated that he did not do anything wrong, and that he would not "rat." He claimed to share his phone with another person and to split the phone bill with that person.

Skuba's Felix Street residence was searched pursuant to a search warrant on July 31, 2009. Evidence suspected to be blood was collected from the downstairs bathroom sink and garage and subjected to DNA analysis. There were more than two contributors to the blood in the sink trap, and Sorokin was not one of them. Sorokin's DNA profile matched the profile of DNA taken from suspected blood on the garage floor, and from suspected blood and hair under the ignition of a scooter in the garage. The match provided "strong evidence" that the DNA detected for those items was from Sorokin.

A senior criminalist from the California Department of Justice testified that not all the suspected blood on the scooter from Skuba's garage was tested for DNA, so it was unknown whether all the blood came from the same person and on the same date. Further, the suspected blood on the scooter was documented, but no in-depth analysis

27

was conducted.  For example, the apparent blood on the scooter included blood spatter and a fine mist.  Blood can be spattered in various ways, including from impact or from being flung off a tool.  The fact that suspected blood and tissue — which the criminalist estimated was a three or four millimeter clump of blood, tissue, and possible hair — were under the ignition likely meant it came up from some kind of impact, such as a beating, or was flung up from below.  There were also blood drops on the scooter that were consistent with being flung off an object, such as an object repeatedly hitting a bloody part of a body.  Blood near the scooter was more consistent with a medium force, such as a beating, with a hand or a tool hitting into an open wound.  Suspected blood on the floorboard area of the scooter was more consistent with a bludgeoning.  A fine mist of specks of suspected blood on the scooter could have been caused by a very fast force, such as a gunshot, a baseball bat, or "high-speed machinery" like a chainsaw, which can break blood up into very tiny specks.  However, experiments would be required to determine what caused the specks.  Further, without a weapon or a wound on a body to examine, and in the absence of evidence from the rest of the scene, the criminalist testified that the information was limited with respect to determining what had happened.

The National 9 motel room, where Senior, Junior, and later Kristin had stayed, was searched pursuant to a search warrant on July 31, 2009.  The items seized included more than three ounces of marijuana; tiny black plastic bags; a pill grinder consistent with a device used to grind marijuana; and bottles containing "green bean" pills, other pills, and marijuana.  The green bean pills appeared to be the same brand as those collected from defendant Clamp's residence.  The quantity of marijuana and the number of tiny baggies were consistent with the sale of marijuana in small quantities.  The marijuana was similar to the type found in defendant Clamp's bedroom, in that it was "well manicured and processed the same" so no leaves or stems were seen protruding from the buds.

28

The search for Sorokin by law enforcement included a search of the coast near Davenport on July 31, 2009, and in the mountains the following week near Bonny Doon Road and Empire Grade. Sorokin's body was not found by the time of trial.

Defendant Hunt voluntarily came to the police department after news reports apparently mentioned his name in connection with the victim who was missing. A video recording of his August 1, 2009 interview by law enforcement was played for the jury. In the interview, Hunt indicated that he knew Skuba through music and would go to Skuba's residence to use the computer. There were a lot of people going in and out of Skuba's residence. Hunt stated that he had not done anything and that someone might be using him as a scapegoat. Hunt provided his mother's address where he claimed to be living with his girlfriend and two children. The residence was searched pursuant to a warrant that evening. Nothing was found to indicate that Hunt, his girlfriend, or the children lived at the residence. One of Hunt's vehicles was at the residence.

An audio recording of a March 2010 phone call between defendant Hunt while he was in jail and a woman was played for the jury. In the call, Hunt states that he had nothing to do with the kidnapping and murder. In seeking the woman's help in finding case law "similar to the situation [he is] dealing with," Hunt states that he "wasn't there" and that there was an "unexpected intervening cause," meaning someone else "who wasn't around during the initial . . . felonies . . . comes in and then takes over and . . . does something else" when Hunt was not present. Hunt explains that if you hit a person in the head, and the person starts bleeding, falls down, and you leave the person, it is reasonable to assume that the person is going to bleed to death right there. He then states that it is not reasonable to assume that someone else is going to walk by, see the person lying there, pick the person up, take the person somewhere, and kill the person.

At some point Skuba was interviewed and arrested in connection with the victim's disappearance.

29

**B.** *The Defense Case*

### 1. Defendant Hunt's Case

A defense investigator for Hunt reviewed cell phone records regarding various individuals and spoke to employees of the cell phone provider. According to the defense investigator, a handset could be up to 10 miles from a cell phone tower and the call information would be recorded.

Between July 14 and 30, 2009, there were no calls between the phones associated with defendants Hunt and Clamp, or between defendants and the victim.

Between July 14 and 30, 2009, there were calls on several days between the phones associated with defendant Hunt and Skuba. One of the calls, on July 20, 2009, was a four-second call at 11:52 p.m., from Skuba's phone to Hunt's voicemail. The phone records do not reflect where Hunt's phone was located. A prior call on Hunt's phone to someone other than Skuba reflects that Hunt's phone was in Santa Cruz at 11:30 p.m.

On July 21, 2009, there were 11 calls between defendant Hunt's and Skuba's phones in the early morning hours between 12:58 a.m. and 3:56 a.m. Many of the calls were not answered or went to voicemail. According to the defense investigator, a series of calls involving Hunt's phone between 1:15 a.m. and 2:00 a.m. were consistent with the phone being out of range of the cell towers associated with the Felix Street residence.

A series of calls involving defendant Clamp's phone between approximately 5:00 a.m. and 7:00 a.m. on July 21, 2009, were not inconsistent with Clamp being at his residence.

On July 25, 2009, Gerardo Rios and Jose Galvan attempted to use the victim's credit card at a store in Watsonville. Rios later told police that he had found more than two credit cards on a trail. Someone also attempted to use the victim's credit card at a Verizon store that same day.

Skuba was subleasing the Felix Street residence from another tenant. The owner of the Felix Street residence testified that the door on the downstairs bathroom opens outward. If the door is open, it is impossible for a person standing near the staircase to see into the bathroom, except through a half-inch crack between the door and the doorframe.

Comcast Cable was provided to tenants of the residence, and no other cable television was hooked up to the residence in July of 2009. The television show "That's So Raven" aired one time in Santa Cruz on July 20, 2009 at 11:30 p.m., and did not air again until the following night on July 21, 2009 at 11:30 p.m.

A college student who lived at the Felix Street residence testified that after he returned from a one-week vacation in June 2009, various items were missing from his residence, including nine personal checks from his checkbook. He was also notified by the bank that his account was overdrawn, after two checks for about $740 were passed.

In June of 2009, Kristin asked Marjorie Jackson, with whom she and Skuba used methamphetamine, to cash a check for her. Kristin told Jackson that she (Kristin) was being paid under the table at work and that she did not have identification or a way to cash the check. Jackson cashed more than one check for Kristin for a total of about $1,000. Eventually, one of the checks bounced and Jackson's checking account "went under." Jackson realized that Kristin "was trying to scam" her. Jackson had never seen defendant Hunt use methamphetamine on the two occasions he had been to her place.

The investigator who interviewed Junior on July 30, 2009, testified that Junior often made statements during the interview as though they were from his own personal knowledge. In asking follow-up questions, the investigator tried to find the source of Junior's information. Junior told the investigator that when he was walking outside Skuba's residence, Skuba came up to him and stated that he (Skuba) had done something that put their lives in jeopardy and that Skuba eventually admitted that he had killed someone. Junior also indicated that he saw a bottle of chloroform that Skuba had, and

31

that Skuba " 'planned it.' "  Junior further told the investigator that Skuba "pulled up first," and then Kenny Wayne, who drove a red Mustang, "followed."  Junior also reported that he saw ten pounds of marijuana in Skuba's closet, and that Skuba still had three pounds of marijuana a week prior to Junior's July 30, 2009 interview.  When asked by an investigator how he could see blood coming off of defendant Hunt's hands into the sink, Junior stated something to the effect that he saw the reflection of the blood in the bathroom mirror through the crack in the door.

When Wentzel was interviewed by an investigator on March 2, 2011, he stated that defendant Hunt did not smoke methamphetamine on the night of the incident.

### 2.  Defendant Clamp's Case

A sheriff's deputy who was assigned to the courtroom for security testified about his observations during trial.  He was seated two or three feet from defendant Clamp during the time that Kristin claimed Clamp made a threatening hand motion.  The deputy testified that he had been watching Clamp and saw Clamp's hand near the neck area, but that he did not see the hand motion.  The deputy also watched the courtroom video and he did not believe that Clamp made a cutting or slashing motion in his neck area.

An attorney assisting in defendant Clamp's defense testified that she watched nearly one weeks' worth, or about 30 hours, of security footage of the courtroom.  At the request of Clamp's counsel, she took notes of any movement that Clamp made around his face with his arms or hands, and specifically movement where he was touching his collar or neck.  Clamp touched his neck, collar, or chin 85 or more times during that timeframe.

Defendant Hunt and defendant Clamp did not testify at trial.

### C.  *Rebuttal*

An investigator for the district attorney's office was sitting in the back of the courtroom when Kristin, who was testifying, pointed to defendant Clamp and said words to the effect of, " 'Why don't you put that on the record?' "  The investigator testified that Kristin had a startled look on her face and her eyes got big before she pointed in the

direction of Clamp, and that she was crying afterwards.  The investigator did not know what caused Kristin's reaction.  Throughout the trial, the investigator had seen defendant Clamp adjust his collar or make movements around his throat.

## D. *Verdicts*

The jury found defendant Hunt guilty of robbery, and not guilty of first degree felony murder and the lesser offense of involuntary manslaughter.  The jury found defendant Clamp guilty of first degree felony murder and robbery.  The jury was unable to reach a verdict on the kidnapping count against Clamp, and a mistrial was declared as to that count.

## E. *Findings on the Priors, Motion for a New Trial, and Sentencing*

Prior to the bifurcated trial on defendant Clamp's alleged prior convictions, and on motion of the prosecutor, the trial court dismissed the prison prior allegation.  The court also granted the prosecutor's motion to amend the information to add an allegation that Clamp had previously been convicted of another robbery.  (§ 211.)  Following the bifurcated trial, the jury found that Clamp had previously been convicted of two separate felony violations of section 211 and one felony violation of former section 245, subdivision (a)(1).

Defendant Clamp filed a motion for new trial and a *Romero* motion,[6] requesting that the trial court strike his strikes.  The trial court denied both motions.  The court sentenced Clamp to prison for an indeterminate term of 75 years to life (25 years to life, tripled) on count 1 for murder, consecutive to a determinate term of 10 years for the prior serious felony conviction enhancements (§ 667, subd. (a)).  The sentence on count 2 for robbery was ordered stayed pursuant to section 654.[7]  On motion of the prosecution, the

---

[6] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

[7] As the abstract of judgment and the minute order of sentencing erroneously state that the sentence on count 2 is concurrent rather than stayed, we will order the abstract of judgment and minute order amended to correct this error.

33

court dismissed count 3 (kidnapping) in the interest of justice. The court granted Clamp 872 days presentence credit for actual time in custody.

The trial court sentenced defendant Hunt to the upper term of five years for second degree robbery.

## III. DISCUSSION

### A. *Defendant Hunt*

#### 1. The Sufficiency of the Evidence

##### a. *The parties' contentions*

Defendant Hunt contends that there is insufficient evidence to establish his intent to commit robbery and his participation in the robbery. He further contends that there is insufficient evidence to establish his liability as a coconspirator or as an aider and abettor.

The Attorney General contends that there is sufficient evidence to support the robbery conviction.

##### b. *Analysis*

" 'Robbery is the taking of "personal property in the possession of another against the will and from the person or immediate presence of that person accomplished by means of force or fear and with the specific intent permanently to deprive such person of such property." [Citation.]' [Citation.]" (*People v. Clark* (2011) 52 Cal.4th 856, 943 (*Clark*).)

"A conspiracy is shown by 'evidence of an agreement between two or more persons with the specific intent to agree to commit a public offense and with the further specific intent to commit such offense, which agreement is followed by an overt act committed by one or more of the parties for the purpose of furthering the object of the agreement.' [Citation.]" (*People v. Longines* (1995) 34 Cal.App.4th 621, 625-626 (*Longines*).) " 'Evidence is sufficient to prove a conspiracy to commit a crime "if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the

34

conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." ' [Citations.]" (*People v. Maciel* (2013) 57 Cal.4th 482, 515-516 (*Maciel*).) " ' "[T]he agreement may be inferred from the conduct of the [individuals] mutually carrying out a common purpose in violation of a penal statute." ' [Citations.]" (*Longines*, *supra*, at p. 626.)

Regarding aider and abettor liability, " '[a]ll persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission, . . . are principals in any crime so committed.' [Citation.] 'Thus, a person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts.' [Citation.] '[O]utside of the natural and probable consequences doctrine, an aider and abettor's mental state must be at least that required of the direct perpetrator . . . .' [Citation.] '[A]n aider and abettor will "share" the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime.' [Citation.]" (*Maciel*, *supra*, 57 Cal.4th at p. 518.)

"Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense. [Citations.]" (*In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1094-1095; accord, *In re Juan G.* (2003) 112 Cal.App.4th 1, 5.) "Mere presence at the scene of a crime is not sufficient to constitute aiding and abetting, nor is the failure to take action to prevent a crime . . . . Likewise, knowledge of another's criminal purpose is not sufficient for aiding and abetting; the defendant must also share that purpose or intend to commit, encourage, or facilitate the commission of the crime." (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 529-530.)

35

"The standard of appellate review for determining the sufficiency of the evidence is settled. On appeal, ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' [Citation.] In conducting such a review, we ' "presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citation.]' [Citations.] 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' [Citation.]" (*People v. Lee* (2011) 51 Cal.4th 620, 632 (*Lee*).)

"An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396 (*Maury*).) " 'It is blackletter law that any conflict or contradiction in the evidence, or any inconsistency in the testimony of witnesses must be resolved by the trier of fact who is the sole judge of the credibility of the witnesses. It is well settled in California that one witness, if believed by the jury, is sufficient to sustain a verdict.' " (*People v. Watts* (1999) 76 Cal.App.4th 1250, 1258-1259 (*Watts*).) "The standard for rejecting a witness's statements . . . requires ' " 'either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.' " ' [Citation.]" (*People v. Thompson* (2010) 49 Cal.4th 79, 124.) "It also is true that uncertainties or discrepancies in witnesses' testimony raise only evidentiary issues that are for the jury to resolve. [Citation.]" (*Watts*, *supra*, at p. 1259.) Reversal is warranted only if it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331 (*Bolin*).)

36

We determine that there is sufficient evidence to support the robbery conviction.

First, there was evidence giving rise to a reasonable inference that defendant Hunt was directly involved in the attack on the victim, given the circumstances under which Hunt was seen at Skuba's residence immediately before and after the attack. Wentzel testified that Hunt was present in Skuba's room when Skuba asked everyone except Hunt to go upstairs. The victim was attacked in the garage thereafter. Junior testified that when he later went downstairs, he saw defendant Hunt, who was coming out of Skuba's room. Hunt appeared "jumpy," looked like he had been in a fight, and told Junior not to " 'worry about' " whatever Junior had heard. Hunt then went into the bathroom and Junior heard the water running. Kristin similarly testified that when she went downstairs, she heard Hunt in the bathroom and the water running. Around this time, Skuba had started the washing machine and changed clothes. A reasonable inference arises that Skuba and Hunt were trying to hide the fact that the attack had occurred and their participation in it.

Kristin testified that she again saw defendant Hunt before she cleaned the blood in the garage. Hunt gave her a bottle of "409" cleaner and asked, "Where did they go[?]" The nature of this encounter with Kristin gives rise to a reasonable inference that Hunt was aware of the attack. Kristin then saw Hunt 45 minutes after Skuba and defendant Clamp had returned to the residence. Significantly, Kristin testified that the bags of marijuana were divided equally among Skuba, Hunt, and Clamp, and that they also divided up the marijuana pills. Given that the estimated value of the marijuana found in Clamp's residence was $7,000 or more, a reasonable inference arises that Hunt's share of the marijuana was also worth a significant sum, and that he had received an equal share because of his significant and direct participation in the attack on the victim.

Second, phone records support the inference that Hunt was involved with Skuba in the attack on the victim. Regarding the time of the attack, the evidence indicates that the attack occurred in the early morning of July 21, 2009, between approximately 12:30 a.m.

37

and 1:00 a.m. Specifically, the last phone call between the victim and Skuba was at 12:31 a.m., which suggests the victim arrived at Skuba's residence sometime thereafter. Kristin testified that after the attack, Skuba talked on his phone and then defendant Clamp came to the residence. The phone records reflect calls between Skuba and Clamp around 1:00 a.m., 2:00 a.m., and 3:00 a.m. on July 21, 2009. The evidence established that by 3:00 a.m., Clamp and Skuba were traveling out of Santa Cruz with the victim. In view of Kristin's testimony about the chronology and timing of events, Clamp must have arrived sometime after the 2:00 a.m. calls, and thus the attack must have occurred between approximately 12:31 a.m. and 1:00 a.m. on July 21, 2009.

Consistent with Hunt participating in an attack during this timeframe, the first call placed on Hunt's phone to anyone on July 21, 2009, was at 12:53 a.m. This meant that Hunt was available to participate in an attack prior to that time. Significantly, there were no calls between Hunt's and Skuba's phones for roughly an hour between about midnight on July 20, 2009, until 12:58 a.m. on July 21, 2009. In contrast, during the early morning hours of July 21, 2009, from about 12:58 a.m. to 4:00 a.m., after the attack had apparently occurred, there were numerous calls between Hunt's and Skuba's phones (although some calls were not answered). There were also three calls from Hunt's phone to Kristin's phone between 12:58 a.m. and 3:07 a.m. Hunt's phone records further indicate that he was in the general area of Felix Street and downtown Santa Cruz between 12:53 a.m. and 4:00 a.m., which is consistent with the inference that he participated in an attack prior to 12:53 a.m. in that area of town, and that he left the residence more than once yet remained close enough to return with the cleaning product for Kristin and to obtain a share of the marijuana. Thus, the frequency, timing, and location of the calls involving Hunt's phone give rise to a reasonable inference that Hunt was involved with Skuba in the attack on the victim.

Third, other evidence concerning Hunt's conduct after the attack gives rise to an inference that he was involved in the attack. For example, when Hunt was interviewed

38

by law enforcement after the incident, he lied about where he was living. As a result, while law enforcement was able to search the residences of Skuba and defendant Clamp, as well as the motel where Kristin, Senior, and Junior were staying, and locate items that were stolen from the victim, law enforcement was unable to conduct a similar search of a residence for Hunt. The jury could reasonably have concluded that Hunt lied about where he was living in order to hide physical evidence of his participation in the crime. Moreover, in the recorded jail call, in which Hunt sought help in finding case law "similar to the situation [he was] dealing with," Hunt appears to acknowledge that he was involved in the initial attack on the victim, but that he was not present when the victim was later moved.

In sum, given the circumstances under which defendant Hunt was observed at Skuba's residence on the night of the attack, the phone records, and Hunt's statements to law enforcement and in a recorded jail call, we determine that substantial evidence supports the inference that Hunt directly participated in the attack on the victim in the garage.

In addition to the evidence that Hunt participated in the attack on the victim, a reasonable inference arises that Skuba discussed with Hunt either just before the attack, or at some earlier point in time, the plan to rob the victim. In this regard, there was evidence that Skuba had planned ahead of time to rob the victim and to use chloroform, that Hunt remained in Skuba's room while Kristin and Wentzel were asked to go upstairs, and that Hunt subsequently participated in the attack. Further, a reasonable inference arises that Hunt was a member of a conspiracy to commit robbery and aided and abetted the robbery, in view of his knowledge about the planned robbery and planned use of chloroform, and his subsequent participation in the attack, which disabled the victim and facilitated the taking of the victim's property. Moreover, he provided Kristin with a cleaning product to clean up the blood in the garage, and he equally shared in the marijuana taken from the victim with Skuba and defendant Clamp. Accordingly, we

conclude that substantial evidence supports Hunt's conviction for robbery. (*Lee*, *supra*, 51 Cal.4th at p. 632.)

## 2. The Evidence of Financial Circumstances

### a. *Background*

Defendant Hunt's interview with law enforcement contains references to his financial circumstances. Prior to the prosecution showing the video of the interview to the jury, Hunt filed a motion in limine to "preclude the prosecution from introducing evidence of his poverty or financial need." Hunt argued that "evidence of the defendant's poverty or financial need at the time of the offense is clearly inadmissible to provide a motive for the robbery or to prove the defendant's intent," citing *People v. Carrillo* (2004) 119 Cal.App.4th 94 (*Carrillo*), among other authorities. He further argued that, although such evidence may be admitted to eliminate other explanations for a defendant's sudden wealth after a theft offense, there was no evidence of Hunt's sudden wealth in this case. The trial court was provided with a transcript of the law enforcement interview, and Hunt's counsel marked those portions that he believed should be redacted regarding poverty or financial need, or otherwise redacted on other grounds.

At a hearing on the motion outside the presence of the jury, the trial court explained that it had reviewed defendant Hunt's interview with law enforcement. The court indicated that its "preliminary thoughts" were as follows: "[R]eferences to lack of employment and[/]or money are minimal in this interview . . . and not emphasized compared to the situation in [*Carrillo*] . . . and other cases that cite *Carrillo*. In those cases, it was . . . clear that the prosecution hammered away each time that a witness or the defendant [lacked money]. [¶] Now, we've also had some testimony about what the value of marijuana is through some of the other witnesses and the amount that Mr. Hunt is alleged to have received. So I do find that the parts about Mr. Hunt's employment and the work that he's doing were -- or not doing work all things considered, could remain."

40

Defendant Hunt's trial counsel argued that the cases did not "turn[] on how much or how little the prosecution emphasizes things" and that the "basic rule" precluded "going into defendant's poverty to show motive to rob." The trial court responded that "[t]he prosecutor kind of went over the top in [*Carrillo*], though." Hunt's counsel stated: "I agree with you it's not super emphasized in here. In fact, I would say generally it's not even, to be forthright, it's not even in response to questioning in a lot of ways but the idea of Mr. Hunt being evicted and . . . he is asked about his work. He says he's been taking care of his newborn and then he works for a while, gets unemployment. I think all those things do go to a lack of wealth, and . . . should be excluded."

The prosecutor argued that although defendant Hunt had disclosed the financial information during his interview with law enforcement, "there isn't a purpose as far as going after these things . . . to establish poverty. . . . [T]his is not a situation like in *Carrillo* or other cases where there is this pursuit by law enforcement as far as showing because you're impoverished or because specifically you're not working at this particular point that you've got a motive to have committed this particular crime or crimes."

The trial court denied defendant Hunt's motion. The court believed that the "general theme" in the opinions where the evidence was excluded was when "there's over emphasis," and *Carrillo* "was over the top." In contrast, when the court "looked at [the detective conducting the interview] and . . . looked at Mr. Hunt and . . . listened to the words within the interview, . . . [the court] just didn't find it was overly obtrusive."

### b. *The parties' contentions*

On appeal, defendant Hunt contends that he "and his interviewer made various references to his lack of employment and money," and that the trial court committed prejudicial error by denying his motion to exclude such references. As for the particular references at issue, Hunt cites seven pages from the transcript of the interview by law enforcement, and indicates that the pages reflect that he "had three small children to feed

41

and house, was not then working, had been evicted, and tried to earn money working on and selling cars."

The Attorney General contends that *Carrillo* is distinguishable with respect to the amount and nature of evidence that was admitted, and that the court in this case did not abuse its discretion in admitting the evidence of Hunt's financial circumstances.

### c. *Analysis*

"Ordinarily, '[e]vidence of a defendant's poverty or indebtedness, without more, is inadmissible to establish motive for robbery or theft because it is unfair to make poverty alone a ground of suspicion and the probative value of the evidence is deemed to be outweighed by the risk of prejudice.' [Citations.]" (*Clark*, *supra*, 52 Cal.4th at p. 929.) There are circumstances, however, "under which evidence of a defendant's unemployment or financial status is relevant and admissible to a charge of robbery . . . ." (*Ibid*.) For example, evidence of a defendant's poverty may be admitted "for the limited purpose of rebutting an assertion that [the defendant] did not commit the charged robberies because [the defendant] did not need money. [Citations.]" (*Ibid.*, fn. omitted.) Alternatively, the evidence may be admissible to eliminate legitimate explanations for the defendant suddenly coming into possession of a greater than usual sum of money after the crimes. (*Ibid.*)

In *Carrillo*, "the prosecution introduced a considerable amount of evidence showing [the defendant] was in difficult financial straits when she allegedly aided and abetted her boyfriend in a robbery." (*Carrillo*, *supra*, 119 Cal.App.4th at p. 97; see *id.* at p. 103.) The boyfriend had taken a chain and medallion from the victim's neck and then had run to the defendant's car. The defendant tried to drive away, but was blocked by another vehicle. The boyfriend fled. The defendant claimed that she had no idea her boyfriend had committed a robbery and that she had no intention of helping him get away. (*Id.* at p. 98.) At trial, the prosecutor elicited "considerable evidence regarding [the defendant's] financial circumstances," including that she was unemployed in the

42

months leading up to the robbery, that her rent was several hundred dollars per month, and that she acquired a car possibly a couple of months before the robbery. (*Ibid.*; see *id.* at pp. 99-100.) In closing argument the prosecutor reminded the jury that the defendant and her boyfriend were out of work at the time of the robbery. (*Id.* at p. 100.) The prosecutor also argued that " 'if you are somebody looking to get something of value so you can get some money, boom, of course, quick, easy, take the chain, guaranteed. Guaranteed value right there. Go to your local pawn store, you get whatever, 50 bucks, whatever it is, 40 bucks.' " (*Ibid.*) The defendant was convicted of robbery. (*Ibid.*)

The appellate court determined that the evidence concerning the defendant's financial situation was inadmissible. The court observed that, " 'Lack of money gives a person an interest in having more. But so does desire for money, without poverty. A rich man's greed is as much a motive to steal as a poor man's poverty. Proof of either, without more, is likely to amount to a great deal of unfair prejudice with little probative value.' [Citation.]" (*Carrillo*, *supra*, 119 Cal.App.4th at p. 102.)

After evaluating the error under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*), the appellate court reversed the judgment. (*Carrillo*, *supra*, 119 Cal.App.4th at pp. 103-104.) The court explained that the case against the defendant "was entirely circumstantial," the defendant "offered the jury a marginally plausible explanation of events that was consistent with her claim of innocence," and the jury appeared to struggle with that explanation in view of the nature of its questions during deliberations. (*Id.* at p. 104.) The court believed that the jury, "knowing [the defendant] was an unemployed, unwed mother on government assistance, . . . may very well have been inclined to view her as a feckless pauper whose station in life and lack of support for her two children provided her with a motive to steal. Although the prosecutor did not expressly argue this point, she did not have to. The evidence of [the defendant's] finances was so extensive, the notion was virtually inescapable." (*Ibid.*)

In this case, the transcript of the law enforcement interview of defendant Hunt is approximately 57 pages single-spaced. On appeal, Hunt cites seven pages as containing objectionable material. We observe that Hunt did not object in the trial court to any material on three of those seven pages. Regarding the other four pages, some of the material that Hunt now claims is objectionable was not the subject of an objection by Hunt below. Because we determine that he was not prejudiced by the admission of the material, we do not address whether Hunt has forfeited his claim with respect to those portions he objects to for the first time on appeal. (See Evid. Code, § 353; *People v. Champion* (1995) 9 Cal.4th 879, 918.)

Specifically, without deciding whether it was error for the trial court to admit those portions of the interview which defendant Hunt claims is evidence of poor financial circumstances, we determine that it is not reasonably probable that a result more favorable to him would have been reached in the absence of the admission of the evidence. (*Watson*, *supra*, 46 Cal.2d at pp. 836-837.)

First, the evidence concerning defendant Hunt's financial circumstances about which he now complains was relatively brief. (*People v. McDermott* (2002) 28 Cal.4th 946, 999 [finding no prejudice in the admission of evidence of the defendant's poverty or indebtedness because the testimony was relatively brief among other reasons].) In the seven pages cited by Hunt as containing objectionable material, there are two references to him having been evicted, two references to him not currently working, one reference to him being unemployed and receiving unemployment insurance, and one reference to him spending the night at his mom's house a lot within the prior two weeks because he was on a budget. We believe Hunt's trial counsel was correct in stating below that the information about Hunt's financial situation was not "super emphasized" during the interview by law enforcement, and that some of Hunt's references to his financial situation were "not even in response to questioning." Moreover, although Hunt was apparently unemployed at the time of the interview, he also indicated that he had worked

within the prior year doing "temp work," customer service, and construction. He also told the interviewer that he was not poor and that he was not homeless.

In addition, regarding Hunt's discussion with the interviewer about working on and selling cars, the pages of the interview transcript cited by Hunt indicate that he had "car issues" with respect to his three cars and for that reason he was "working" on his cars. He indicated he intended to sell only one of them, a Gran Torino, "while the movie is still out." Admitting into evidence these references to Hunt owning and fixing three cars, one of which he planned to sell at an opportune time, was not prejudicial error in this case. Similarly, the admission into evidence of references to *Skuba's* indebtedness to Hunt over a bicycle, and Hunt's attempt to collect that debt, was not prejudicial error in Hunt's case. (See *Clark*, *supra*, 52 Cal.4th at p. 929 [stating that evidence of a " 'defendant's' " indebtedness is generally inadmissible to establish a motive for a robbery].)

Second, defendant Hunt does not identify any question posed by the prosecutor to a witness suggesting that Hunt's motive for the robbery was based on his financial circumstances. Significantly, the prosecutor did not argue to the jury that Hunt's motive to commit the robbery was based on his financial circumstances. (See *Clark*, *supra*, 52 Cal.4th at p. 930 [finding no prejudicial error because, among other reasons, the prosecutor "did not refer to defendant's unemployment or poverty during closing remarks when urging the jury to convict him of robbery"].)

In arguing that the admission of evidence concerning his financial status resulted in prejudicial error because the case was "close," defendant Hunt observes that jury deliberations lasted three days, the jury asked for a read back of a portion of Junior's testimony, the jury sent a note indicating that it was considering the lesser charge of grand theft, and the jury failed to convict on all counts.

We are not persuaded by defendant Hunt's arguments. Regarding the length of jury deliberations, the record reflects that there were extensive trial proceedings in a case

45

involving a serious crime and multiple perpetrators. More than 40 witnesses testified on 20 days between May 24 and August 4, 2011, and numerous exhibits were admitted into evidence. Jury instructions were given on August 8, 2011, and counsel presented argument to the jury on August 9, 10, and 11, 2011. Under these circumstances, the length of deliberations suggests a diligent and conscientious jury. (Cf. *People v. Cooper* (1991) 53 Cal.3d 771, 837 [deliberations for 27 hours showed a "conscientious" jury, rather than a close case, in a three-month trial with complex scientific testing]; *People v. Houston* (2005) 130 Cal.App.4th 279, 301 [deliberation over four days may reflect jury's diligence and "conscientious performance," rather than a close case, where extensive trial proceedings involved more than three dozen witnesses on 10 days spread over three weeks, and lengthy closing arguments and jury instructions spread over two additional days].)

Hunt also bases his argument that this was a "close case," and that therefore the admission of evidence concerning his financial status resulted in prejudicial error, on the jury's request for a read back of some of Junior's testimony, the jury's note concerning the lesser charge of grand theft, and the jury's failure to convict on all counts. Regarding the read back of testimony, the jury requested Junior's testimony "starting when he comes down the stairs until just after where he is on the sidewalk and Skuba comes out and talks to him. Both direct and cross-examination." Hunt fails to explain the significance of this request with respect to the admission of evidence about his financial circumstances and whether prejudicial error occurred. In this regard Hunt also fails to persuasively explain the significance of the following jury question, "Can Hunt be found guilty of manslaughter without being guilty of grand theft?" (Cf. *People v. Filson* (1994) 22 Cal.App.4th 1841, 1852 [holding that erroneous rulings could not be found harmless where, among other factors, the "jury deliberated long and hard, troubled (as evidenced by its request for additional instructions) by the matter of defendant's intent, the very issue the defense would have developed but for the trial court's rulings"], disapproved on

46

another ground in *People v. Martinez* (1995) 11 Cal.4th 434, 452.)  Lastly, Hunt fails to persuasively articulate why the jury's finding of guilt as to the robbery charge, and its findings that he was not guilty as to the first degree felony murder and involuntary manslaughter charges, reflect that the case was close regarding the robbery conviction.

In sum, in view of the limited and at times favorable references to defendant Hunt's financial circumstances, the lack of any argument by the prosecutor that Hunt's financial circumstances were a motive for the robbery, and the substantial evidence of Hunt's involvement in the robbery as described above, we determine that it is not reasonably probable that a result more favorable to defendant Hunt would have been reached in the absence of the admission of the evidence concerning his financial circumstances.  (*Watson*, *supra*, 46 Cal.2d at pp. 836-837.)

### 3.  The Out-of-Court Statements

#### a.  *Background*

Prior to trial, the prosecutor filed a memorandum of points and authorities seeking to introduce at trial Skuba's statements to Kristin that "the chloroform didn't work" and because of that they had "gotten into a fight."  According to the prosecutor, Skuba made this statement to Kristin *after* disposing of the victim's body and returning to the residence.  The prosecutor contended that this and other statements by Skuba were "admissible as coconspirator statements against defendants Hunt and Clamp" under Evidence Code section 1223.

Defendant Hunt filed opposition, contending that there was insufficient evidence that he had conspired with Skuba to rob the victim, and that even if there was evidence of a conspiracy, the coconspirator exception to the hearsay rule did not apply to many of Skuba's alleged statements.  Hunt requested a hearing pursuant to Evidence Code sections 402 and 403 with respect to the statements that Kristin claimed Skuba had made to her.  Hunt contended that Skuba's alleged statement about the chloroform and a fight "is not admissible as an exception to the co-conspirator rule as the conspiracy had ended

47

and the statement does not in any way further the conspiracy. Skuba makes this alleged statement to [Kristin] after disposing of Mr. Sorokin and returning to his house. Skuba's statement is merely a description of past events that does not 'in some measure, or to some extent, aid[] or assist[] towards . . . the consummation of the object of the conspiracy.' "

The trial court held a hearing (see Evid. Code, §§ 402-403) at which Kristin testified about the incident involving the victim and Skuba's statements to her. Kristin testified that, after hearing the incident in the garage and going downstairs where she heard defendant Hunt in the bathroom, she smoked a cigarette outside with Skuba. Skuba told her, " 'The chloroform didn't work; that they got into a fight. He's knocked out. Do not go in there.' " Kristin testified that Skuba and Clamp eventually left the residence.

After Kristin testified at the pretrial hearing, the trial court tentatively ruled that the conspiracy was "ongoing" from defendant Hunt's arrival at Skuba's residence to the division of the marijuana. The court further determined that Skuba's statements to Kristin, that the " 'chloroform didn't work,' " that they "got into a fight," and that she should not "go in there," were admissible as a "continuing statement of the conspiracy."

The following day, the trial court clarified its tentative ruling and heard argument from counsel before making its "final ruling." The court clarified that its tentative ruling was to allow the following statement by Skuba to Kristin as a statement in furtherance of the conspiracy: " 'The chloroform didn't work. We got into a fight. He's knocked out. Do not go there.' "

Defendant Hunt's counsel argued that the portion, " 'we got into a fight,' " should be "redact[ed]" to "I got in a fight," so that the statement referred only to Skuba. The court disagreed and ultimately determined that Skuba's statement would be allowed at trial as previously set forth in its tentative ruling, and that the conspiracy began when Hunt arrived at Skuba's residence and did not end until the next morning when everyone left the residence after the marijuana was divided up.

48

Kristin testified at trial that, after hearing the incident in the garage and going downstairs where she heard defendant Hunt in the bathroom, she smoked a cigarette outside with Skuba. Skuba told her that the chloroform "didn't work," that " '[w]e got into a fight,' " and that the person was "knocked out" in the garage. Kristin also testified that, in an initial interview with investigators, she had reported that Skuba told her to "keep it solid," "don't say anything," and "don't go in the garage."

### b. *The parties' contentions*

On appeal, defendant Hunt contends that the trial court prejudicially erred in admitting Skuba's statements "that the chloroform did not work and 'we' got into a fight" under the coconspirator's exception to the hearsay rule set forth in Evidence Code section 1223. Hunt contends that (1) there was insufficient evidence of a conspiracy and (2) the statements did not further the objective of a conspiracy to commit robbery.

The Attorney General contends that defendant Hunt forfeited the second contention, that the statements were properly admitted under the coconspirator's exception to the hearsay rule, and that any error was harmless.

### c. *Analysis*

As an initial matter, we understand defendant Hunt to challenge the court's *pretrial* ruling that Skuba's statements were admissible under the coconspirator's exception to the hearsay rule. Hunt's argument that the ruling was erroneous is based, however, on the insufficiency of the evidence *at trial* regarding whether there was a conspiracy.

" '[T]he general rule is that "when an in limine ruling that evidence is admissible has been made, the party seeking exclusion must object at such time as the evidence is actually offered to preserve the issue for appeal . . . ." ' " (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 159 (*Letner*), italics omitted.) "[A]n in limine motion, without a contemporaneous objection at trial, is sufficient to preserve an objection for appeal only when '(1) a specific legal ground for exclusion is advanced and subsequently raised on

49

appeal; (2) the motion is directed to a particular, identifiable body of evidence; and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context.' " (*Id.* at p. 160.)

In this case, the trial court made its pretrial determination of the existence of a conspiracy, and that Skuba's statements were made in furtherance of the conspiracy, after Kristin testified at the pretrial hearing (see Evid. Code, §§ 402-403). Defendant Hunt makes no argument that the trial court's ruling was erroneous based on Kristin's testimony at the pretrial hearing. Rather, Hunt's argument is directed to the sufficiency of the evidence presented at trial. To that extent, however, Hunt was obligated to object at trial to Kristin's testimony about Skuba's statements, the lack of sufficient evidence of a conspiracy, and the lack of a statement in furtherance of a conspiracy. Hunt fails to provide a citation to the record reflecting that such an objection was made at trial. At that time, " 'the trial judge [could have] determine[d] the evidentiary question in its appropriate context.' " (*Letner, supra*, 50 Cal.4th at p. 160.) In view of Hunt's failure to show that an objection was made during trial to the testimony about which he now complains, we determine that he has failed to preserve his claim on appeal.

Even assuming defendant Hunt preserved his claim for appeal, we determine the claim is without merit for the following reasons.

We apply the abuse of discretion standard in reviewing the trial court's determination to admit or exclude hearsay evidence. That standard applies to questions about the existence of the elements necessary to satisfy the hearsay exception. (*People v. Poggi* (1988) 45 Cal.3d 306, 318-319; *People v. Martinez* (2000) 22 Cal.4th 106, 120.)

"Under Evidence Code section 1223, evidence of a hearsay 'statement' of a coconspirator is inadmissible against the defendant absent ' "independent evidence to establish prima facie the existence of . . . [a] conspiracy." ' [Citations.]" (*People v. Cowan* (2010) 50 Cal.4th 401, 482.) We have already determined there is substantial evidence that defendant Hunt was a member of the conspiracy to rob the victim.

50

"Once independent evidence to establish the prima facie existence of the conspiracy has been shown," the prosecution must also show " ' "that the declaration was in furtherance of the objective of that conspiracy." ' " (*People v. Hinton* (2006) 37 Cal.4th 839, 895.) " '[W]hether statements made are in furtherance of a conspiracy depends on an analysis of the totality of the facts and circumstances in the case.' [Citation.]" (*People v. Arceo* (2011) 195 Cal.App.4th 556, 578.)

Defendant Hunt contends that Skuba's statements to Kristin shortly after the attack that the chloroform did not work and " '[w]e' " got into a fight were "merely a narrative description of past events," "did not advance the objectives of the conspiracy," and "did not seek to enlist Kristin's cooperation or assistance. That did not come until much later when, before they left, Skuba or Clamp told her to clean up the blood in the garage."

We are not persuaded by defendant Hunt's argument. In addition to Skuba's statements to Kristin that the chloroform "didn't work" and that " '[w]e got into a fight,' " there was also evidence that Skuba told Kristin that the victim was "knocked out" in the garage, "don't say anything," and "don't go in the garage." A reasonable inference arises that Skuba was concerned Kristin would go into the garage, see the crime scene, and subsequently interfere with, meddle in, or otherwise hamper the ongoing conspiracy to rob the victim, divide the items taken from the victim, and hide the crime. Indeed, Kristin was later told to get out of the victim's truck when looking for something to steal, and was told to clean up the garage only after the victim was removed from the garage. Skuba may have also been concerned that the victim might regain consciousness while Kristin was in the garage. Accordingly, by telling Kristin what had happened in the garage and the victim's status, it is reasonable to infer that Skuba was trying to give Kristin a compelling reason to stay out of the garage until the victim was moved and to keep quiet about the events of that evening. Hunt fails to show an abuse of discretion by the trial court in admitting Skuba's statements on the basis that they were made in furtherance of the conspiracy.

51

**B.** *Defendant Clamp*

### 1. The Sufficiency of the Evidence

#### a. *The parties' contentions*

Defendant Clamp contends that there is not substantial evidence that the victim was still alive when Clamp first became involved in the incident, and that his convictions for robbery and murder, which was based on a felony-murder theory, must therefore be reversed. According to Clamp, his involvement began when he purportedly told Kristin to clean up the blood in the garage, and before Skuba retrieved the victim's body and loaded it into the truck.

The Attorney General contends that the jury could reasonably have concluded that the victim was alive when Clamp became involved.

#### b. *Analysis*

As we stated above, in determining the sufficiency of the evidence, " ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' [Citation.] In conducting such a review, we ' "presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citation.]' [Citations.]" (*Lee*, *supra*, 51 Cal.4th at p. 632.) We "must accept logical inferences that the jury might have drawn from the circumstantial evidence." (*Maury*, *supra*, 30 Cal.4th at p. 396.) "A reasonable inference, however, 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence.' " (*People v. Morris* (1988) 46 Cal.3d 1, 21, disapproved on another point in *In re Sassounian* (1995) 9 Cal.4th 535, 543-544, fn. 5.)

Defendant Clamp and the Attorney General agree that Clamp arrived at Skuba's residence at least an hour to an hour and a half after the assault on the victim. This estimate is consistent with the evidence. As we explained above, the attack occurred between approximately 12:31 a.m. and 1:00 a.m., and Clamp arrived sometime after the calls with Skuba around 2:00 a.m.

Substantial evidence supports a finding that defendant Clamp became involved while the victim was alive. Kristin testified that when she saw Skuba on the patio after the attack, he stated that the chloroform did not work, that a "fight" had occurred, and that the victim was "knocked out." Kristin's testimony that she did not hear any noises coming from the garage after the attack is consistent with Skuba's comment that the victim was "knocked out."

Further, the conversation between defendant Clamp and Skuba after Clamp's arrival at the residence supports a finding that the victim was alive after the attack in the garage. According to Kristin, Clamp asked Skuba "if he could live with this for the rest of his life." Skuba stated, " 'Yes, he *knows* where my mom lives.' " (Italics added.) The logical inference from Skuba's response is that the victim was still alive in the garage after the attack.

Regarding the crime scene, Kristin testified that there was a "bunch" of blood in the garage, including "specks" that appeared to have been "flung" and a "pool" of blood that contained most of the blood. Although the exact amount of blood in the garage was not established, Kristin testified that she cleaned up the garage with two bottles of cleaner, along with a towel and a "torn T-shirt that was already there for" oil leaks There was no evidence suggesting that the amount of blood lost by the victim necessarily meant the injury suffered by the victim was fatal.

The criminalist from the state crime lab testified about the patterns of apparent blood in the garage but was not able to offer any opinion as to what happened to the victim. According to the criminalist, the blood patterns may have been the result of an

impact from a beating with a hand or a tool, from being flung off an object, from a bludgeoning, and/or from a very fast force, such as a gunshot, baseball bat, or "high-speed machinery" like a chainsaw. The criminalist testified that an in-depth analysis of the blood spatter was not conducted, that experiments were required to determine the cause of some of the specks of suspected blood, and that, in the absence of a weapon or a wound on a body to examine, the information was limited as to determining what happened in the garage.

However, the noises reported by the witnesses who heard the attack were consistent with a fight, rather than the use of a gun or "high-speed machinery" to attack the victim as suggested by the criminalist. Kristin testified that she heard "banging" noises, and that it sounded as though "somebody was getting in a fight," with "a bunch of movement" and "something was in the way and they knocked it over." Wentzel similarly testified that he heard a "ruckus, like someone was moving a lot of stuff around" or "knocked some stuff over," and that there were banging and slamming noises. Senior likewise testified that he heard a "furniture noise," such as a chair moving. Junior testified that it sounded as though someone was getting "beaten up."

In sum, substantial evidence supports a finding that the victim was alive *immediately following the attack in the garage*, in view of the witnesses' testimony about the noises emanating from the garage which were consistent with a fight not involving a gun or high-speed machinery; Skuba's comments to Kristin that the chloroform did not work, a "fight" had occurred, and the victim was "knocked out"; and Skuba's later conversation with defendant Clamp that included Skuba's statement that the victim " '*knows* where [Skuba's] mom lives.' " (Italics added.) Further, it was reasonable for the jury to infer that the victim was still alive when Clamp and Skuba had the discussion about the victim and when Clamp thereafter told Kristin to clean up the blood, because Clamp and/or Skuba had checked on the victim by going through the side door to the garage near Skuba's room, or because Skuba already knew the victim was still alive

54

based upon the nature of the attack and the condition of the victim immediately thereafter.  Indeed, given that the victim was alive immediately after the attack, it is not unreasonable to infer that Skuba at some point checked on the victim to make sure he was still knocked out before Skuba and Clamp had the discussion about what to do with the victim.  In other words, the nature of the conversation between Skuba and Clamp supports an inference that at least one of them did check on the victim and that the victim was still alive at that time.

Although defendant Clamp acknowledges that this court "does not subjectively assess witness credibility," he nevertheless contends that Skuba's statements, including that the victim was knocked out and that the victim knew where Skuba's mom lived, came from Kristin who "was a weak, inconclusive, and questionable source."  Clamp also points to Junior's testimony that Skuba stated to him outside the residence after the attack that their lives were "in jeopardy."  Clamp contends that this statement, along with the lack of noise or movement in the garage, the nature of the assault, and the amount of blood and its pattern, "all point to [the victim] Sorokin either having died during the attack, or having survived for a very short time, and certainly not until Skuba dragged his body to the truck."

As the California Supreme court has explained, " '[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.'  [Citation.]" (*Lee*, *supra*, 51 Cal.4th at p. 632.)  Further, "[t]hat the evidence might lead to a different verdict does not warrant a conclusion that the evidence supporting the verdict is insubstantial.  [Citation.]" (*People v. Holt* (1997) 15 Cal.4th 619, 669.)  Reversal is warranted only if it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*Bolin*, *supra*,

18 Cal.4th at p. 331.)  In this case, as we have explained, substantial evidence supports the finding that the victim was alive after the attack, including at the point when Clamp arrived and when he shortly thereafter told Kristin to clean up the blood.  We therefore determine that Clamp's claim of insufficiency of the evidence does not warrant reversal of the judgment.

## 2. The Out-of-Court Statements

### a. *Background*

Defendant Clamp joined in a pretrial motion in limine by defendant Hunt to exclude statements by Skuba to Kristin.  In the motion, Hunt contended, among other arguments, that Skuba's statements "must be limited to those statements specifically disserving of Skuba's interest" in order to be admitted as declarations against interest under Evidence Code section 1230, and that any statements admitted must be redacted to eliminate any reference to defendants.  Relevant here, Hunt specifically referred to Skuba's statement to Kristin "that 'they' disposed of the body."  To the extent the trial court was inclined to admit Skuba's statements, Hunt requested a hearing pursuant to Evidence Code sections 402, 403, and 702 to determine, among other things, what Roberts was claiming Skuba had told her.

At a hearing prior to trial, Skuba invoked his Fifth Amendment right not to testify. The trial court found him to be an unavailable witness under Evidence Code section 240.

After hearing argument from the parties concerning Kristin's anticipated testimony about out-of-court statements by Skuba and defendants, the trial court conducted a hearing (see Evid. Code, §§ 402-403).  Kristin testified that after the marijuana was divided up and defendants had left Skuba's residence, Skuba told her what they had done with the victim.  According to Kristin, Skuba stated that "they drove up north and threw his body off a cliff and he could hear it go thudding down the cliff."  On cross-examination by Hunt's counsel, Kristin further testified:  "[Skuba] said that he drove [victim] Elias'[s] truck and Clamp drove some other truck, followed him up north

wherever they went and they threw the body off a cliff there. They could hear it thudding all the way down." When asked by Clamp's counsel whether Skuba provided any specifics about his conduct, Kristin testified: "Stewart [Skuba] drove [victim] Elias Sorokin's truck. Clamp followed him. They drove up the coast and they threw Elias Sorokin's body off the cliff and it went thudding down." Kristin further testified on cross-examination that Skuba did not provide a detailed description about the body being thrown off the cliff, and that he did not tell her "who was positioned where."

The prosecution subsequently filed a motion to admit into evidence Skuba's statements on the ground that they were declarations against interest under Evidence Code section 1230. After hearing argument from counsel, the trial court explained that the statement concerning driving a body up, throwing it off a cliff, and the thudding sound was "clearly" a statement against interest. Based on the information elicited on cross-examination of Kristin at the pretrial hearing, the court believed that there was "no shifting of blame or responsibility" by Skuba to Clamp. The court told counsel that "it would be more appropriate to give you all a few hours to digest that and come back at 1:30 with your responses. [¶] But my tentative ruling would be to admit the statement" that Skuba and Clamp "drove the body up and they threw the body up." The court cited several cases which were "the basis of [the court] ruling tentatively." The court told Clamp's counsel that "we'll take up your arguments at 1:30." The record on appeal does not reflect that Clamp's counsel made any further argument on the issue of the inadmissibility of Skuba's statement, or that the court issued a final ruling on the issue.

Kristin testified at trial, without objection from defendant Clamp, that she asked Skuba what "they did with [the victim]." Skuba told her that "they went up the coast," "[he] was driving Elias's vehicle and [Clamp] was right behind him in a red truck," "Elias was in the back of his truck," "they threw him off a cliff and they could hear his body go thudding down," and "[t]hey came back to [Skuba's]."

57

**b.** *The parties' contentions*

On appeal, defendant Clamp contends the trial court erred by admitting Skuba's out-of-court statements pursuant to the hearsay exception for declarations against interest under Evidence Code section 1230. Clamp contends that Skuba's statements were "partially, if not wholly, exculpatory" and that, "to the extent some were against his interest, they were not properly redacted to eliminate the portions that were not."

The Attorney General contends that the trial court did not err in admitting Skuba's statements, and that any error was harmless.

**c.** *Analysis*

As an initial matter, none of defendant Clamp's citations to the record reflect that the trial court made a final ruling on the issue which had been raised in pretrial motions by defendants and the prosecution. " 'A tentative pretrial evidentiary ruling . . . will not preserve the issue for appeal if the appellant could have, but did not, renew the objection . . . and press for a final ruling . . . .' " (*People v. Ennis* (2010) 190 Cal.App.4th 721, 736.) In *Ennis*, the court explained: "[T]he distinction between a tentative ruling and a final one does not turn on whether the court has given significant consideration to the issue; it turns on whether the court has finished its consideration of the issue. Here, the court made clear it had not, and explicitly agreed to hear further argument on the issue [at a later point]. It was [defendant], and not the court, who decided not to pursue the matter further, and thus it was [defendant] who abandoned the issue. Having done so, [defendant] cannot complain that the court erred in its ruling." (*Ibid.*, italics omitted.) Similarly, in the instant case, the trial court twice indicated that its ruling to admit Skuba's statements was tentative, and it expressly stated that it would "take up" argument from Clamp's counsel later that day. In the absence of any indication that Clamp pursued the matter further in the trial court, we determine that he may not contend on appeal that the ruling was erroneous.

Even assuming Clamp has not abandoned the issue, we determine that there is no basis for reversing his convictions due to the admission of Skuba's statements.

"In California, '[e]vidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true.' ([Evid. Code,] § 1230.)  The proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character.  [Citation.]" (*People v. Duarte* (2000) 24 Cal.4th 603, 610-611 (*Duarte*).)

" 'To determine whether [a particular] declaration [against penal interest] passes [Evidence Code][section 1230's] required threshold of trustworthiness, a trial court "may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant." '  [Citation.]  We have recognized that, in this context, assessing trustworthiness ' "requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception." '  [Citation.]" (*Duarte*, *supra*, 24 Cal.4th at p. 614.)

"There is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against [penal] interest exception.  The trial court must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry.  [Citations.]" (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 334 (*Greenberger*).)  "When examining what was actually said by the declarant special attention must be paid to any

59

statements that tend to inculpate the nondeclarant. This is so because a statement's content is most reliable in that portion which inculpates the declarant. It is least reliable in that portion which shifts responsibility. Controversy necessarily arises when the declarant makes statements which are self-inculpatory as well as inculpatory of another. This is why Evidence Code section 1230 only permits an exception to the hearsay rule for statements that are specially disserving of the declarant's penal interest. [Citation.] This is not to say that a statement that incriminates the declarant and also inculpates the nondeclarant cannot be specifically disserving of the declarant's penal interest. Such a determination necessarily depends upon a careful analysis of what was said and the totality of the circumstances. [Citations.]" (*Id*. at p. 335.)

In *People v. Cervantes* (2004) 118 Cal.App.4th 162 (*Cervantes*), a nontestifying codefendant, Morales, inculpated himself and his two codefendants, Cervantes and Martinez, in a murder and an attempted murder while speaking to a friend of all three defendants, Ojeda. (*Id*. at pp. 166-167.) On appeal the two codefendants contended that Morales's statement to the friend should have been excluded. (*Id*. at p. 169.) The appellate court found that the trial court did not err in admitting evidence of the statement at the defendants' joint trial. Following *Greenberger*, the court found that the statement qualified as a declaration against penal interest and satisfied the constitutional standard of trustworthiness. (*Cervantes, supra,* at p. 177.) "The evidence here showed Morales made the statement within 24 hours of the shooting to a lifelong friend from whom he sought medical treatment for injuries sustained in the commission of the offenses. . . . Regarding the content of the statement, Morales did not attribute blame to Cervantes and Martinez but accepted for himself an active role in the crimes and described how he had directed the activities of Martinez." (*Id*. at p. 175.) "Ojeda consistently reported that Morales admitted shooting at the second male with Cervantes. The statement Cervantes shot the first male, as well as the statement Morales shot at the second male, both incriminated Morales because Morales was acting in concert with Cervantes at all

60

relevant times. Thus, the discrepancies in the statement as repeated by Ojeda do not preclude a finding the statement was trustworthy." (*Id.* at p. 176.) "Regarding the claim the statement should have been redacted to exclude reference to the nondeclarants, *Greenberger* specifically held this is not required where the statement admitted into evidence is disserving to the interests of the declarant. We agree with *Greenberger's* analysis on this point." (*Ibid.*)

In this case, Skuba stated that "they went up the coast," "[he] was driving Elias's vehicle and [Clamp] was right behind him in a red truck," "Elias was in the back of his truck," "they threw him off a cliff and they could hear his body go thudding down," and "[t]hey came back to [Skuba's]." Skuba's statements implicated himself, as well as defendant Clamp, in the crimes against the victim. Skuba did not attempt to mitigate his own conduct or to shift the blame to Clamp. As Clamp acknowledges on appeal, the statements implicated both of them as being equally responsible. Further, at the time Skuba made the statements to Kristin, he had no motive to lie. "[T]he most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures. [Citations.]" (*Greenberger*, *supra*, 58 Cal.App.4th at p. 335; *Cervantes*, *supra*, 118 Cal.App.4th at p. 175.) Under these circumstances, we determine that Skuba's statements to Kristin were against his penal interest and bear a particularized guarantee of trustworthiness. Further, "[r]egarding the claim the statement should have been redacted to exclude reference to the nondeclarant[], . . . this is not required where the statement admitted into evidence is disserving to the interests of the declarant." (*Cervantes*, *supra*, 118 Cal.App.4th at p. 176.) Accordingly, the admission of Skuba's statements did not violate state law.

Assuming one or more of Skuba's statements, such as the statement that "[defendant Clamp] was right behind him in a red truck," should have been excluded, we determine that the error was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836-837 (*Watson*). (See *Duarte*, *supra*, 24 Cal.4th at pp. 618-619.) Skuba's statements, as

61

described by Kristin at trial, established that Skuba and Clamp drove up the coast in separate vehicles, that Skuba was driving with the victim in the victim's truck, that Skuba and Clamp disposed of the victim's body, and that they then returned to Skuba's residence.

First, this testimony was essentially cumulative because other testimony by Kristin, combined with the cell phone records, established most of the same facts. For example, Kristin testified that she saw Skuba walk to the garage with a blanket, and that she heard the garage door open, a "dragging" sound, "a big thud" like someone was being put in the truck bed, and then the tailgate shut. She then heard two trucks reverse out of the driveway. Her descriptions of the gold and red trucks that she had earlier seen at Skuba's residence were consistent with the victim's truck and the truck for which defendant Clamp had keys. When Kristin subsequently went into the garage to clean it, the victim was not there. Kristin further testified that Skuba and Clamp returned to the residence after more than an hour, and that Hunt did not arrive until 45 minutes after them. The cell phone records were consistent with Skuba and Clamp traveling in separate vehicles on Highway 1 north about the same time, and with both of them being near the coast and out of the range of cell phone towers from about 3:00 a.m. to 4:00 a.m., whereupon the two of them returned in tandem to Santa Cruz. In contrast, Hunt's phone records were consistent with him remaining in the general area of Felix Street and downtown Santa Cruz between approximately 1:00 a.m. and 4:00 a.m.

We do not believe that the jury would have *rejected* this other testimony by Kristin (along with the corroborating cell phone records) which established Skuba's and defendant Clamp's movements with the victim, and instead *relied* on testimony *by Kristin* about *Skuba's* statements to establish the same facts. To the extent the jury believed Kristin, her testimony about *Skuba's* statements concerning Clamp's and his movements with the victim was essentially redundant. Kristin's testimony about Skuba's statements could only serve to buttress her other testimony and the cell phone records,

and either the jury already found that other testimony credible or it did not; Kristin's vouching for her own testimony through statements attributed to Skuba would add nothing to the jury's credibility evaluation of Kristin.

Second, the specified statements by Skuba did not resolve one of the key issues raised by defendant Clamp – whether the victim was still alive at any point during Clamp's involvement. Rather, the specified statements by Skuba were inconclusive on the issue of whether the victim was still alive during the timeframe covered by Skuba's statements.

Third, defendant Clamp's involvement was demonstrated by independent and more convincing evidence than Kristin's testimony about what *Skuba said*. In addition to Kristin's testimony regarding Clamp's presence, statements, and conduct at Skuba's residence after the victim was attacked, the cell phone records just discussed indicate that Clamp's movements were coordinated with Skuba's following the removal of the victim from the residence. Further, testimony by investigators established that Clamp had gas cans in his room, which buttressed testimony that he was involved in burning the victim's truck. Also in Clamp's room was marijuana in a North Face bag, which was the same brand of bag that Clamp had used to carry his share of the victim's marijuana from Skuba's residence, and green bean pills similar to the ones that Kristin brought to the motel. This evidence corroborated Kristin's testimony that Clamp had received a share of the victim's drugs, and strongly supported the inference that Clamp was involved in the crimes perpetrated against the victim. In sum, Clamp's level of involvement following the attack on the victim was more convincingly established by other evidence than Kristin's testimony concerning *Skuba's statements*.

Defendant Clamp suggests that his coordinated movements with Skuba after the victim was removed from the garage, as reflected in the cell phone records, "could simply have indicated that [Clamp] went home for a while" given that Clamp lived on the west side of Santa Cruz. Clamp does not cite any evidence to support the assertion that the

63

movement of his cell phone at that time could be consistent with him going home. To the extent Clamp cites testimony concerning cell phone evidence that may be consistent with him being at his residence on the west side of Santa Cruz, the evidence pertains to calls on his phone between 5:00 a.m. and 7:00 a.m., which was at least an hour *after* he and Skuba had returned to Santa Cruz.

Defendant Clamp also argues that his "liability must be based on assisting Skuba in *disposing* of [the victim's] body," the prosecutor "consistently argued this theory," and that "[t]he only direct evidence of his involvement came from Kristin's testimony about Skuba's statements." (Italics added.) The record reflects, however, that the prosecutor argued aiding and abetting by Clamp at an *earlier* point in time. The prosecutor argued that Clamp, after he arrived at the residence, "immediately jump[ed] into this thing" involving marijuana as far as "need[ing] to get rid of" the victim. According to the prosecutor, Clamp aided, facilitated, promoted, encouraged, and/or instigated Skuba's commission of the robbery before they left the residence with the victim. For example, the prosecutor referred to Clamp's question to Skuba, about whether he could live with it for the rest of his life, as an indication of Clamp communicating, "yeah, I can do it, . . . just as long as you're not going to get weak on me at some point, let's do it." The prosecutor argued that Clamp must have had some conversation with Skuba indicating that Clamp would "go with" Skuba to "take [the victim] someplace." We also observe that Kristin testified that Clamp told her to clean up the blood in the garage before he and Skuba left the residence. In sum, there was evidence other than the statements at issue by Skuba that strongly pointed to Clamp's involvement in the incident well before the actual disposition of the victim's body.

Defendant Clamp also argues that this was a close case because the jury deliberated for "almost three days." As we have explained above regarding defendant Hunt's contentions, we are not persuaded that the length of deliberations in this case

supports a finding of prejudicial error. Rather, given the extensive nature of the trial, the length of deliberations suggests a diligent and conscientious jury.

In sum, we conclude that it is not reasonably probable that a result more favorable to defendant Clamp would have been reached in the absence of the purported error in admitting the specified statements by Skuba. (*Watson*, *supra*, 46 Cal.2d at pp. 836-837; *Duarte*, *supra*, 24 Cal.4th at pp. 618-619.)

### 3. The Response to the Jury's Note

#### a. *Background*

Defendant Clamp's counsel acknowledged making "a tactical decision" with Clamp during trial to decline a jury instruction regarding the crime of accessory after the fact. As the court later observed, defendant Clamp's counsel made the "tactical decision" to not seek an instruction regarding accessory liability under section 32, a lesser related offense, "even when [the prosecutor] requested it during" the jury instruction conference.

After the jury had been instructed and during deliberations, the jury sent a note to the trial court stating: "There is some confusion about charges: [¶] . . . [¶] . . . Can Clamp be found guilty of <u>another</u> crime of 'accessory after the fact'?" The court met with the parties outside the presence of the jury and stated: "[T]he answer to that is no because that lesser related instruction was not requested." Defendant Clamp did not object to this proposed answer by the court and did not request any further instruction to the jury in response to the question. The court ultimately responded, "No," in writing to the jury.

#### b. *The parties' contentions*

On appeal, defendant Clamp contends that the trial court committed prejudicial error by failing to "clarif[y] the jury's understanding of [accessory after the fact], and/or elaborat[ing] on its answer to ensure the jury correctly understood it, and thus understood what it had to determine to find [him] guilty." Clamp argues that the court must instruct on defense theories, and that he "essentially relied on having been an accessory as a

65

defense, i.e. since the substantive offenses were complete before he arrived he could not be found guilty of them, because he only helped cover them up." Clamp further argues that, "what an accessory is, and how that related to [his] potential guilt, was a general principle of law governing the case, necessary for the jury to understand the case, and [his] theory of defense. At a minimum, the court should have clarified the jury's understanding, and further instructed to ensure [his] theory of defense was properly explained and presented."

The Attorney General contends that defendant Clamp has forfeited the claim because he earlier *objected* to an accessory after the fact instruction sought by the prosecution, and he did *not* object to the trial court's response to the jury question. The Attorney General further contends that there is no reasonable likelihood that the jury misapplied the law, and therefore the court did not err in its response to the jury.

### c. *Analysis*

We determine that defendant Clamp has forfeited his claim by failing to object to the trial court's response to the jury's note. (*People v. Boyette* (2002) 29 Cal.4th 381, 430 [the defendant did not object to the court's proposed decision not to respond to a juror's note and thus he failed to preserve the issue for appeal "and, indeed, may be held to have given tacit approval of the trial court's decision"]; see *People v. Bohana* (2000) 84 Cal.App.4th 360, 373 [a defendant's consent to the court's response to jury questions waives any claim of error regarding the response].)

Even if defendant Clamp has not forfeited the claim, he fails to persuade us that the trial court should have provided a different response.

A trial court's response to jury questions is governed by section 1138, which provides: "After the jur[ors] have retired for deliberation, . . . if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given

66

in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called." (§ 1138.)

"[T]he statute imposes a 'mandatory' duty to clear up any instructional confusion expressed by the jury." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212; *People v. Moore* (1996) 44 Cal.App.4th 1323, 1331 [court must "help the jury understand the legal principles it is asked to apply"].) However, "[t]his does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.] Indeed, comments diverging from the standard are often risky. [Citation.]" (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.) "An appellate court applies the abuse of discretion standard of review to any decision by a trial court to instruct, or not to instruct, in its exercise of its supervision over a deliberating jury." (*People v. Waidla* (2000) 22 Cal.4th 690, 745-746.)

In this case, no abuse of discretion has been shown. Defendant Clamp acknowledges that "the jury was properly instructed on the charged offenses." At the same time, he explains that he "does not claim the court should have given a substantive accessory instruction that would have opened up the possibility of a conviction for that offense." Consequently, given that the jury was properly instructed on the charged offenses, and given that those charged offenses did *not* include liability as an accessory, the court did not abuse its discretion in responding in the negative to the jury's question about whether Clamp could be found guilty of another crime of accessory after the fact. The jury's question was clear and simple, and a short answer of "no" was warranted and sufficient. Moreover, under the circumstances, we believe that inquiring into the jury's understanding of an accessory and instructing on principles of law concerning an

accessory, as proposed by Clamp on appeal, would have introduced additional and irrelevant issues into the case by the court[8] and potentially caused juror confusion.

We are also not persuaded by defendant Clamp's attempt to characterize the issue of an accessory as a "defense" that the trial court should have instructed on, and that the court's failure to do so violated his federal constitutional rights. Being an accessory to a robbery is not a defense to robbery. Rather, being an accessory is a separate criminal offense. (§ 32; *People v. Jennings* (2010) 50 Cal.4th 616, 668 (*Jennings*) ["Being an accessory to murder is not a defense to aiding and abetting the commission of murder—it is a separate criminal offense"].) A defendant may be convicted of both robbery and being an accessory to robbery if the defendant aids the principal both before and during, as well as after, the robbery is committed. (See *Jennings*, *supra*, at p. 668.) In this case, an issue for the jury was whether defendant's involvement occurred before or after the victim's death. Receiving instructions on accessory principles, which pertain to a defendant's conduct after a felony has been committed, would not have assisted the jury in the determination of when the victim died. Defendant fails to demonstrate error in the court's succinct response to the jury's note.

### 4. The Presentence Custody Credit

#### a. *The parties' contentions*

The trial court granted defendant 872 days presentence credit for the actual time he purportedly spent in custody prior to sentencing. On appeal, defendant Clamp contends that he should have received a total of 953 actual days credit, reflecting the time

---

[8] We note that defendant Clamp argues on appeal that "the jury, without the issue having been mentioned, raised this legal issue on its own." The record reflects, however, that defendant Clamp's counsel raised the issue of accessory after the fact in argument to the jury. Counsel argued that, to the extent Clamp did anything after the victim was dead, "it's called an accessory after the fact. It's a different crime. . . . It's not the crimes he's charged with. . . . [Y]ou could argue that he would be guilty of coming along after the fact and helping . . . Skuba dispose of [the victim's] remains. Again, we don't have proof of that at all."

he was purportedly taken into custody on July 30, 2009, through sentencing on March 8, 2012.

The Attorney General contends that defendant Clamp was taken into custody on a parole hold in another case in July 2009, and that he was not in custody for the murder charge in this case until February 3, 2010. Because Clamp fails to establish that "the conduct that led to his conviction in this case was a 'but for' cause of his custody during the earlier period," the Attorney General contends that Clamp is not entitled to custody credit for the earlier period.

In reply, defendant Clamp contends the trial testimony reflects that law enforcement searched for and found him in connection with the investigation of the victim's disappearance, took him into custody on July 30, 2009, and questioned him the next day about the case. Clamp argues there is no evidence that his time in custody was for any reason other than his alleged involvement in the crimes against the victim, and it is speculation to state the parole hold was for something other than those events.

### b. *Analysis*

Penal Code section 2900.5 provides that a convicted person shall receive credit against the person's sentence for all days spent in presentence custody (subd. (a)), but "*only* where the custody to be credited is attributable to proceedings related to the *same conduct* for which the defendant has been convicted" (subd. (b), italics added). (See *People v. Bruner* (1995) 9 Cal.4th 1178, 1180.) "The California Supreme Court has interpreted the language of Penal Code section 2900.5, subdivision (b) to mean 'a prisoner is not entitled to credit for presentence confinement unless he shows that the conduct [that] led to his conviction was the sole reason for his loss of liberty during the presentence period.' (*People v. Bruner*, *supra*, 9 Cal.4th at p. 1191.) Thus, presentence custody credits should be denied toward a new term when such custody is 'attributable to a parole revocation caused in part, but not exclusively, by the conduct that led to the new sentence.' (*Id*. at pp. 1182-1183.) To be entitled to presentence custody credits, a

defendant must establish that 'the conduct [that] led to the sentence was a dispositive, or "but for," cause of the presentence custody.' (*Id*. at p. 1180.)" (*People v. Kennedy* (2012) 209 Cal.App.4th 385, 392 (*Kennedy*).)

In this case, the probation report states that "[o]n July 31, 2009, Kenneth Clamp was arrested by the Santa Cruz County Sheriff's Office on a parole hold." The probation report further states that "[o]n February 3, 2010, Clamp was arrested in custody for the murder, kidnapping and robbery of Sorokin." On appeal, defendant Clamp does not dispute that he was initially arrested on a parole hold in July 2009, and that he is not entitled to additional custody credit unless the conduct that led to his sentence was a "but for" cause of this earlier period in custody.

We determine that defendant Clamp fails to make the requisite showing. Clamp points to trial testimony concerning law enforcement's investigation in the instant case and his arrest. The cited testimony does not reflect the basis for the parole hold or how the parole matter was resolved. It is possible that Clamp was arrested for a parole violation based on his possession of methamphetamine and a glass methamphetamine pipe at the time his residence was searched on the evening of July 30, 2009. In the absence of further information about the parole hold, Clamp fails to show " 'that the conduct [that] led to his conviction was the sole reason for his loss of liberty during the presentence period' " (*Kennedy*, *supra*, 209 Cal.App.4th at p. 392; *People v. Bruner*, *supra*, 9 Cal.4th at p. 1191), or that " 'the conduct [that] led to the sentence was a dispositive, or "but for," cause of the presentence custody' " (*Kennedy*, *supra*, at p. 392; *People v. Bruner*, *supra*, at p. 1180). We therefore conclude that Clamp is not entitled to additional presentence custody credit.

We further observe that, based on defendant Clamp's arrest in this case on February 3, 2010, through the date of sentencing on March 8, 2012, he is entitled to 765 actual days credit, rather than the 872 actual days credit granted by the trial court. We will modify the judgment accordingly.

70

### IV.  DISPOSITION

In case No. H037380 against defendant Adam Spencer Hunt, the judgment is affirmed.

In case No. H038256 against defendant Kenneth Kirk Clamp, the judgment is modified by awarding defendant a total of 765 actual days credit.  The abstract of judgment and the March 8, 2012 minute order of sentencing are ordered corrected to reflect the oral pronouncement of judgment by stating that the term on count 2 is stayed pursuant to Penal Code section 654.  As so modified the judgment is affirmed.

_____

BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____

MÁRQUEZ, J.

_____

GROVER, J.